# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-2407

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of South Dakota. |
| Keith L. Wright, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: March 10, 2008
Filed: August 27, 2008 (Corrected September 19, 2008)

_____

Before WOLLMAN, BOWMAN, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

A jury convicted Defendant Keith L. Wright of seven counts of aggravated sexual abuse of a child under 18 U.S.C. §§ 1153 and 2241(c). The district court[1] sentenced Wright to concurrent life terms for each count and ordered him to pay a fine of $25,000. Wright appeals numerous issues from his trial and sentencing. We affirm.

_____

[1]The Honorable Karen E. Schreier, Chief Judge, United States District Court for the District of South Dakota.

I.    Background

Wright lived with his mother, Rena Wright, Rena's three other biological children, and several other children of whom Rena was the guardian. When he was 28 years old, Wright was indicted for and convicted of sexually abusing three children living with Rena. He was indicted for aggravated sexual abuse of T.L.C. "on or about between" November 6, 1997, to November 5, 2000; aggravated sexual abuse of J.L.C. "on or about between" December 9, 1994, to December 8, 2001; and attempted aggravated sexual abuse of J.L.W. "on or about between" November 21, 1998, to November 20, 1999.

A.    T.L.C.

T.L.C. was placed with Rena when T.L.C. was about six years old, after her mother died. She lived with Rena for approximately eleven years. Wright sexually abused T.L.C. during this time. She first reported the abuse to Peri Strain, an advisor at her school. Strain filed a report, and the government began investigating.

At the time of Wright's trial, T.L.C. was eighteen years old. T.L.C. testified that before the abuse, she considered Wright her brother. She testified that Wright began abusing her when she was about six or seven years old. Wright initiated the first instance of abuse when she was watching a movie with her brothers. Wright told T.L.C. to go into a room with him. Inside the room, Wright penetrated her vagina with his penis. T.L.C. testified that the abuse continued until she was about twelve years old, and penis-to-vagina intercourse occurred between twenty and fifty times. T.L.C. testified that Wright also put his fingers inside her vagina and made her touch his penis with her hand. Wright was convicted of three counts of aggravated sexual abuse of T.L.C., each count covering one year between November 1997 and November 2000.

B.    J.L.C.

During the course of the investigation regarding Wright's abuse of T.L.C., T.L.C.'s brother, J.L.C., disclosed sexual abuse to Special Agent Oscar Ramirez. J.L.C. was three years old when he started living with Rena. J.L.C. testified he thought of Wright as a big brother. When J.L.C. was about five years old, Wright began abusing him. J.L.C. testified that Wright "would do some . . . nasty stuff to [him]." Wright "would use his penis and stick it in [J.L.C.'s] butt and nasty stuff like that." The abuse occurred "like five or six times" and continued until J.L.C. was about eleven. J.L.C. "tried to fight it," but testified he "was just too little." Wright gave to J.L.C. "certain stuff and then . . . kept on telling [him] not to tell anybody about what happened and stuff."

J.L.C.'s older brother, T.J.L.C., witnessed Wright abusing J.L.C. when T.J.L.C was about five or six years old and J.L.C. was about four or five years old. T.J.L.C. testified: "I saw my brother, my little brother [J.L.C.] stooped over the bed, his pants and his underwear down to his ankles. Then I saw [Wright] behind him with his pants pulled down . . . . [Wright] started having sexual intercourse with my little brother." T.J.L.C. testified Wright "was forcing his penis in my brother's butt" and that J.L.C. was "crying." At this point, T.J.L.C. went outside and stayed there until Rena got home. T.J.L.C. testified he told Rena this, but that "she wouldn't listen." T.J.L.C. testified that he witnessed Wright abusing J.L.C. again about one year later. Wright was convicted of three counts of aggravated sexual abuse of J.L.C. for conduct occurring roughly between December 1994 and December 2001.

C.    J.L.W.

J.L.W. testified she considered Wright to be a big brother. J.L.W. testified that when she was about six years old, she was in her room playing on the bed when Wright walked in. Wright was "[b]eing nice . . . and talking nice." He put his hand on her leg and tried to pull down her pants. She "tried to yell for help," but Wright covered her mouth with his hand. J.L.W. tried to move Wright's hand. Wright did

not remove his own clothing or J.L.W.'s clothing. J.L.W. kept yelling for Rena, who came in and said "don't." Wright then got up and left. J.L.W. told Rena what had happened, but Rena "didn't believe" her. The jury heard testimony from Agent Ramirez that Wright told him "he had . . . tried to do things with [J.L.W.]." And that "nothing happened but that it got close." Wright was convicted of attempted aggravated sexual abuse of J.L.W.

### D.     Suppression Hearing

Wright moved to suppress statements he made to Agent Ramirez, asserting Agent Ramirez violated Wright's Fifth and Sixth Amendment rights. At a hearing on this motion, Agent Ramirez testified based on his typewritten interview report, which the district court admitted into evidence. Agent Ramirez created this report based on his handwritten interview notes. During the hearing, the government asked Agent Ramirez what time he began interviewing Wright. Agent Ramirez asked whether he could look at a book containing a notation he made based on his handwritten notes. This refreshed his recollection as to the time the interview began, which was not contained in the interview report.

Wright asked to see the interview notes. The government agreed to show Wright the notation on the book Agent Ramirez was using to refresh his recollection but objected to producing the handwritten interview notes themselves. The court "direct[ed] that the journal entries in the book before the witness be provided to Defense" but denied Wright's request for the interview notes. The court asked whether the government "would . . . have an objection if those notes [were] produced for in camera inspection for the Court to" determine how the information contained in the notes compared with the interview report. The government objected, and the court did not require Agent Ramirez's notes to be given to Wright or the court, stating that any potential inconsistencies could "be addressed through appropriate examination."

II.    Discussion

A.    Subject Matter Jurisdiction—Juvenile Delinquency Act

Wright argues federal courts lack subject matter jurisdiction in this case under the Juvenile Delinquency Act, which provides that a federal court generally does not have jurisdiction over "[a] juvenile alleged to have committed an act of juvenile delinquency." 18 U.S.C. § 5032. This argument fails, as Wright was indicted when he was 28 years old, and was thus no longer a "juvenile" within the statute's definition. See 18 U.S.C. § 5031 (defining "juvenile" as one "who has not attained his eighteenth birthday, or for the purpose of proceedings and disposition under this chapter for an alleged act of juvenile delinquency, a person who has not attained his twenty-first birthday"); see also United States v. Hoo, 825 F.2d 667, 669–70 (2d Cir. 1987) ("[C]ourts have consistently held that a defendant who is alleged to have committed a crime before his eighteenth birthday may not invoke the protection of the Juvenile Delinquency Act if criminal proceedings begin after the defendant reaches the age of twenty-one." (citing In re Martin, 788 F.2d 696, 697–98 (11th Cir. 1986); United States v. Araiza-Valdez, 713 F.2d 430, 432–33 (9th Cir. 1983); and United States v. Doe, 631 F.2d 110, 112–13 (9th Cir. 1980))).

B.    Attempted Aggravated Sexual Abuse Conviction

Wright argues the trial court should have granted a judgment of acquittal on the attempt charge as to J.L.W. because the evidence was insufficient to establish Wright performed a substantial step toward any of the four statutory definitions of aggravated sexual abuse. "In reviewing for sufficiency of the evidence, we view the evidence in the light most favorable to the verdict, and we will overturn a conviction only if no reasonable jury could have concluded that the defendant was guilty beyond a reasonable doubt on each essential element of the charge." United States v. Kenyon, 481 F.3d 1054, 1067 (8th Cir. 2007) (internal quotation omitted).

-5-

For the government to establish Wright's guilt for attempted aggravated sexual abuse of J.L.W., it must establish that Wright had "an intent to engage in" the sexual abuse by knowingly attempting to cause J.L.W. to engage in a sexual act and that Wright committed "conduct constituting a substantial step toward commission of the substantive offense [that] strongly corroborates [his] criminal intent." Id. (internal quotation omitted). The statute defines the substantive offense, a sexual act, as:

> (A) contact between the penis and the vulva or the penis and the anus, and for purposes of this subparagraph contact involving the penis occurs upon penetration, however, [sic] slight;
> (B) contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus;
> (C) the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person; or
> (D) the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person[.]

18 U.S.C. § 2246(2).

J.L.W. testified Wright tried to pull down her pants. Wright "had his hand on [J.L.W.'s] leg." She "tried to yell for help," but Wright "covered [her] mouth" with his hand. Wright left the room after Rena came in the room. Both Wright and J.L.W. were fully clothed. Wright did not stop on his own or when J.L.W. resisted, but only after Rena discovered him. Additionally, Agent Ramirez testified: "At first I asked [Wright] if he had done anything with [J.L.W.]. He denied it at first. After further questioning, he described that he had only tried to do things with [J.L.W.]. And then he described it as it got close."

In support of his insufficient-evidence claim, Wright relies on <u>United States v.</u> <u>Blue Bird</u>, 372 F.3d 989 (8th Cir. 2004), and <u>United States v. Plenty Arrows</u>, 946 F.2d 62 (8th Cir. 1991). We find these cases distinguishable. In <u>Blue Bird</u>, we found that the evidence was insufficient to show the defendant had taken a substantial step toward sexual contact, yet we noted that "the fact that [the defendant] desisted and withdrew when [the alleged victim] said that she was not interested, indicates that [the defendant] at most merely solicited some kind of sexual contact." <u>Blue Bird</u>, 372 F.3d at 993. In the instant case, however, Wright did not withdraw when J.L.W. tried to yell for help. Unlike the defendant in <u>Blue Bird</u>, Wright only stopped and left when Rena discovered him.

In <u>Plenty Arrows</u>, we found that the defendant's act of placing his penis against the back of the victim's buttocks was not a substantial step toward penetrating his anus. 946 F.2d at 66. The defendant's act was not of "an unequivocal nature" to "establish beyond a reasonable doubt that [the defendant] intended to proceed beyond touching the back of the victim's behind to penetration, however slight, of the victim's anus." <u>Id.</u> (quotation and alternation omitted). Wright argues that if placing one's penis against the buttocks of a victim was not a substantial step in <u>Plenty Arrows</u>, then his actions in this case cannot constitute a substantial step. We reject this argument for two reasons.

First, when <u>Plenty Arrows</u> was decided in 1991, "sexual act" required penetration or contact with the mouth. <u>Id.</u> at 64; <u>see also</u> § 2245(2) (1991).[2] Today,

---

[2]This 1991 provision defined "sexual act" as:

    (A) contact between the penis and the vulva or the penis and the anus, and for purposes of this subparagraph contact involving the penis occurs upon penetration, however, [sic] slight;
    (B) contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus; or
    (C) the penetration, however slight, of the anal or genital opening

however, the term "sexual act" is broader. Penetration is not required, as the definition of sexual act includes "the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person . . . ." 18 U.S.C. § 2246(2)(D). Unlike in Plenty Arrows, the government here did not need to establish Wright took a substantial step toward penetrating J.L.W. Wright's conviction stands if he took a substantial step toward the commission of "the intentional touching, not through the clothing, of the genitalia of" J.L.W. Id.

Second, not only does the government need to establish less in this case than it needed to establish in Plenty Arrows, the evidence in this case is greater. Here, unlike in Plenty Arrows, the defendant said that he had tried to do things with J.L.W. and that "it got close." Wright's statements, along with his acts, allow us to "determine the actor's ultimate intent," which we were unable to do in Plenty Arrows. 946 F.2d at 66. "The chief purpose of the substantial step requirement is to corroborate the actor's specific intent to commit the crime," and J.L.W.'s testimony along with Wright's statements that "it got close" establish Wright had the specific intent to commit the crime. Id. (internal quotations omitted). Wright tried to pull down J.L.W.'s pants, he put his hand on her leg, he covered her mouth with his hand, and he admitted that he "tried to do things with" her and that "it got close." This evidence is stronger than the evidence in Plenty Arrows, and it is sufficient to "establish beyond a reasonable doubt that [the defendant] intended to proceed beyond" his actions to intentionally touching J.L.W.'s genitalia not through the clothing, with an intent to abuse her or arouse someone. Id.; see 18 U.S.C.

---

of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person[.]

18 U.S.C. § 2245(2) (1991).

§ 2246(2)(D); see also Blue Bird, 372 F.3d at 933 (suggesting that attempting to take off one's own pants and passing out on top of a child may be sufficient to establish attempted sexual assault).

### C. Constructive Amendment

Wright also argues that the indictment was constructively amended. He points out that the government alleged and produced evidence of between twenty-six and fifty-six acts of abuse at the grand jury proceedings and trial and that he was only convicted of six counts of abuse and one count of attempt. Thus, Wright argues, it is impossible to determine which acts of abuse were the basis for the grand jury's indictment and which acts of abuse were the basis for the petit jury's conviction. As a result, he argues there is a substantial likelihood he was convicted for acts of abuse he was not charged with. He argues that because specific acts of abuse were not identified and because he was not charged with nor convicted of fifty-six counts of abuse, he can still be charged and convicted of the other acts of abuse he committed during this time period, and that this violates double jeopardy.

Wright's constructive-amendment argument fails, as the indictment and jury instructions are identical in all relevant respects. See United States v. Whirlwind Soldier, 499 F.3d 862, 870 (8th Cir. 2007) ("A constructive amendment occurs when the essential elements of the offense as charged in the indictment are altered in such a manner . . . that the jury is allowed to convict the defendant of an offense different from or in addition to the offenses charged in the indictment."). The government chose to indict Wright of six counts of abuse for the multiple acts of abuse he committed against specific individuals during specific time periods. The indictment and the jury instructions did not include specific dates but rather included the same time ranges, and all the evidence at the grand jury proceeding and trial regarded multiple acts of abuse that occurred during these time periods. The government can not again charge or convict Wright of acts of sexual abuse he committed against the

stated victims during the stated time periods. Thus, double jeopardy concerns are not implicated.

In support of his argument, Wright cites a Ninth Circuit case involving a variance, not a constructive amendment, United States v. Tsinhnahijinnie, 112 F.3d 988 (9th Cir. 1997). The Ninth Circuit found a variance between the indictment and evidence at trial because the indictment charged the defendant with committing crimes "between June 1992 and July 1992," but the evidence at trial was only sufficient to enable a jury to find crimes occurred in 1994, not 1992. Id. at 989–90. In the instant case, however, the evidence presented at trial did not differ from the evidence that supported Wright's indictment. The evidence presented at trial did not prove facts "materially different from those alleged in the indictment," as required for us to find a variance. Whirlwind Soldier, 499 F.3d at 870 (internal quotation and modification omitted). Therefore, we find no variance.

D.    Jencks Act

Wright argues that the government intentionally and in bad faith refused to comply with the Jencks Act when it refused to turn over Agent Ramirez's notes. The Jencks Act, 18 U.S.C. § 3500, "requires the district court, on the motion of the defendant, to produce any 'statements' of a government witness that relate to the subject matter of the witness's testimony, after the witness has testified on direct examination." United States v. New, 491 F.3d 369, 376 (8th Cir. 2007) (citing 18 U.S.C. § 3500(b)). The Act only applies to "statements," and it defines "statements" narrowly. See 18 U.S.C. § 3500(e)(1)–(3). For our purposes, Ramirez's interview notes constitute statements only if they were "written statement[s] made by [the government] witness and signed or otherwise adopted or approved by him." 18 U.S.C. § 3500(e)(1).

Wright does not specify how the interview notes constitute a "statement." Because his argument is unclear, we first consider whether the Jencks Act requires the production of any alleged statements made by Wright himself and then whether the Act requires the production of any alleged statements made by Agent Ramirez. The Jencks Act does not apply to any statements by Wright himself, as the Act applies only to "a Government witness or prospective Government witness (*other than the defendant*)." 18 U.S.C. §§ 3500(a) (emphasis added). Furthermore, Wright does not allege he "adopted" the interview notes or that the notes constitute a "verbatim recital" of his statement, and such an adoption or recital would be necessary for the interview notes to constitute a "statement" of Wright's. 18 U.S.C. §§ 3500(e)(1)–(2).

Additionally, the Jencks Act does not apply to any of the "statements" allegedly made by Agent Ramirez contained in his notes. Any alleged "statements" by Agent Ramirez would consist solely of "the agent's interpretations or impressions," which the Supreme Court has held are "not to be produced." Palermo v. United States, 360 U.S. 343, 353 (1959).

We thus hold the district court's failure to hold an in camera review of Agent Ramirez's notes from his interview with the defendant was not in clear error. See New, 491 F.3d at 376 ("We review a district court's ruling under the Jencks Act for clear error.").[3]

E.    Hearsay

---

[3]Wright raises a claim of prosecutorial misconduct based on alleged violations of the Jencks Act, the rule against admission of hearsay testimony, and the prohibition on leading questions. Wright does not, however, explain how these violations amount to prosecutorial misconduct. Because we reject Wright's underlying allegations, we do not address his claim of prosecutorial misconduct.

-11-

Wright also alleges the district court impermissibly admitted hearsay evidence on many occasions. We conclude that any error the district court may have committed is harmless.

### i. Witness Testimony

Two witnesses, Peri Strain and Jody Callaway, had conversations with T.L.C. and testified about the actions they took in response to those conversations. Specifically, Strain testified that, based on what T.L.C. had told Strain, Strain told T.L.C. that Strain was a mandatory reporter. Callaway testified that, based on what T.L.C. had told her, Callaway sought advice from her pastor and reported her conversation with T.L.C. to the sheriff's office: "I shared with [an officer] that [T.L.C.] had been molested for a long time." Callaway also testified: "I told [the officer] what [T.L.C.] had told me and then I said that it was her brother Keith [Wright]."

The district court admitted their testimony over Wright's hearsay objections, and we review the admission of this evidence for abuse of discretion and "revers[e] only when an improper evidentiary ruling affected the defendant's substantial rights or had more than a slight influence on the verdict." United States v. Shields, 497 F.3d 789, 792 (8th Cir. 2007). We hold that some of the testimony is not hearsay and that any error the district court may have committed in the admission of hearsay testimony was harmless.

The witnesses' testimony about actions they took in response to the conversations is not hearsay. See United States v. Walker, 636 F.2d 194, 195 (8th Cir. 1980). Callaway's testimony that she sought advice from her pastor and that she reported the conversation to the sheriff's office is thus not hearsay.

However, Callaway's testimony identifying Wright as the perpetrator of the abuse may constitute inadmissible hearsay. See United States v. Brown, 110 F.3d 605, 609 (8th Cir. 1997) ("We are troubled, however, with the portion of [the witness'] testimony which explained that an informant identified [the defendant] as a person [committing the crime]."). While Strain's and Callaway's testimony is admissible if offered to "provide[] the jury with background information as to why the police began their investigation," id., we are not wholly convinced the witnesses' detailed testimony was necessary for background. The testimony was instead likely offered for the truth of the matter asserted and thus raises hearsay problems. See United States v. Azure, 845 F.2d 1503, 1507 (8th Cir. 1988) (finding that "[t]he only possible relevance of [a social worker's testimony regarding the victim's out-of-court] identification of [the defendant] and of the government's subsequent investigation of him is that he in fact was the person who abused her" and holding this was inadmissible hearsay).

Regardless of whether the evidence was improperly admitted, however, the admission of Strain's and Callaway's testimony constituted harmless error. T.L.C. herself identified Wright as the perpetrator, and Wright was not asserting T.L.C. had mistaken his identity. Thus, we find that the admission of alleged hearsay testimony in this case did not prejudice Wright. See Azure, 845 F.2d at 1507; see also United States v. Wipf, 397 F.3d 677, 682 (8th Cir. 2005) (noting that the victim's testimony regarding sexual abuse "mirrored" the testimony of the witness and thus the witness' "testimony was merely cumulative and did not likely influence the jury").

ii. Victim Testimony

Wright also alleges the district court improperly admitted hearsay evidence provided by the victims. Wright did not object to the admission of this evidence at trial, and we review the evidence's admission for plain error. See United States v. Carter, 410 F.3d 1017, 1026 (8th Cir. 2005) (noting that the failure to object to

statements made during closing arguments results in our court reviewing the statements' admission for plain error).

Wright alleges T.L.C.'s testimony that she "mention[ed]" the sexual abuse to Peri Strain is hearsay. T.L.C. testified: "I didn't tell her about what really happened to me. I—but I did mention, you know, the abuse and stuff that was going on." T.L.C. also responded, "[s]omewhat," to the question of whether she "talk[ed] specifically to [Strain] about what had happened." T.L.C. testified she "talked to [Agent Ramirez] about it," and that she told him "[i]t happened often, but it wasn't more than I want to say 50 times." Additionally, T.L.C. testified that she "didn't say nothing" to the U.S. Attorney regarding whether the charges should be dropped.

We hold T.L.C.'s testimony regarding whether conversations occurred is not hearsay. See Walker, 636 F.2d at 195 (describing a case holding that a witness can testify as to what he did after talking with an informant, and it is not hearsay). Furthermore, if we assume without deciding that T.L.C.'s testimony about her conversation with Agent Ramirez regarding the frequency of abuse was hearsay, its admission was harmless error.

J.L.C. also testified about his conversation with Agent Ramirez. During J.L.C.'s testimony, the government said: "And when you were asked about this by Oscar Ramirez you also talked about nasty stuff, and then you described what nasty stuff meant. Can you do that, please[?]" We hold J.L.C.'s testimony defining "nasty stuff" was not hearsay, as he was not asked to state what he told Agent Ramirez. The question merely reminded J.L.C. of a previous time he defined the phrase and asked him to define the phrase then for the court. J.L.C. also read a statement that he gave to Agent Ramirez describing Wright's abuse and testified that T.L.C. "would tell me about it [Wright doing things to T.L.C.] but I never really seen anything." This testimony was also cumulative. Wright does not allege T.L.C. was mistaken as to the

identity of her abuser, and we hold that any error in admitting the evidence was harmless.

F.     Leading Questions

Wright argues the district court improperly admitted leading questions in T.L.C.'s direct examination. Wright objected to some of these leading questions, and this court reviews the admission of these questions for abuse of discretion. Whether leading questions are permitted "is a matter generally left to the discretion of the trial judge." United States v. Anderson, 446 F.3d 870, 876 (8th Cir. 2006).

We find that T.L.C.'s direct examination contained numerous leading questions. Some of these questions were permissible for the purpose of clarifying vague testimony. Additionally, regardless of whether the admission of the questions and answers was an abuse of discretion, their admission constituted harmless error.

We note first, however, that not all of the allegedly leading questions were, in fact, leading. Wright objected to the question: "As this was going on, [T.L.C.], did [Wright] ever say anything to you about . . . reporting it or words to that effect?" While this question can be answered with yes or no, it is not leading as it does not suggest its own answer. See De Witt v. Skinner, 232 F. 443, 445 (8th Cir. 1916) ("The test of a leading question is whether it suggests or indicates the particular answer desired."). Thus, the district court did not abuse its discretion in overruling Wright's objection.

Wright also objected to questions asked to clarify T.L.C.'s testimony as to the frequency and nature of abuse. T.L.C. testified: "I'd be walking—there was this one time where I was walking and he went and he just grabbed my butt and stuff like that. And touched me between the legs and just —." Counsel then asked: "Would he put his fingers inside of you?" and T.L.C. responded affirmatively. Counsel then asked

"When I say 'inside of you,' I mean would he put his fingers inside your vagina?" These questions are leading. We generally allow leading questions during the examination of children who are reluctant to testify. See United States v. Demarrias, 876 F.2d 674, 678 (8th Cir. 1989) (allowing leading questions to be asked of a young child who "exhibited a reluctance to testify in other forms"). However, T.L.C. was an adult witness who had not indicated a reluctance to testify. Nevertheless, we find that the district court did not abuse its discretion by determining that the leading questions were necessary to clarify T.L.C.'s testimony and to establish the "precise physiological details of sexual assault," which was necessary to define the crime. United States v. Grassrope, 342 F.3d 866, 869 (8th Cir. 2003) ("It is not uncommon that precise physiological details of sexual assault must be elicited by focused questioning."). The district court also did not abuse its discretion in overruling Wright's objections to these questions. See Anderson, 446 F.3d at 876 ("Leading questions generally are not permitted during direct examination, but may be used where 'necessary to develop the witness' testimony.'" (quoting Fed. R. Evid. 611(c))).

Wright alleges counsel asked T.L.C. other leading questions,[4] but he did not object to these questions. Thus, we review these questions for plain error and are "limited to determining if there is an error that is plain and that affects substantial rights." United States v. Smith, 378 F.3d 754, 755 (8th Cir. 2004), vacated on other grounds, Smith v. United States, 543 U.S. 1136 (2005). Even when such an error has occurred, "we will not exercise our discretion unless the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. at 756. The questions at issue were leading; however, we hold that the admission of these questions was not in plain error. "Even if some of the leading questions were excessive, [defense counsel] was free to probe the witness on cross-examination, and we see no substantial and injurious influence on the verdict arising from the manner in which the examination was conducted." Anderson, 446 F.3d at 876.

---

[4]Specifically, we highlight the following:

Q: And do you recall [Peri Strain] saying something to you like I'm a mandatory reporter and I'm —
A: Yes.
Q: "I'm going to have to report it to law enforcement or to the authorities?"
A: Yeah.
Q: Okay. And did basically you end the conversation at that point?
A: Yes.

. . .

Q: . . . And where were you living then [when you had the conversation with Strain]?
A: Juanita Kilborn's.
Q: Okay. Did you feel safe at that point?
A: Yes.
Q. Is that in part why you decided to make a disclosure?
A: Yes.

G.    Sentencing

Wright argues the trial court erred in calculating the sentencing guideline range in three respects.  We review the district court's factual findings for clear error and the application of the guidelines de novo.  United States v. Yah, 500 F.3d 698, 702 (8th Cir. 2007) ("We review for clear error the district court's factual findings underlying the imposition of a sentencing enhancement based on the defendant's role in the offense, and examine de novo the application of the Guidelines." (quotation and citation omitted)).

i.    Applicable Guideline Version

Wright argues the trial court violated the ex post facto clause by applying a five-level enhancement under U.S. Sentencing Guidelines Manual § 4B1.5.  This section became  effective November 1, 2001, and a defendant cannot be sentenced under this amendment unless he committed a sex crime after November 1, 2001.  Wright alleges he did not engage in criminal activity after this date.  Unless the district court clearly erred in determining Wright committed an offense after November 1, 2001, we will affirm the application of the 2001 enhancement.  See Carter, 410 F.3d at 1027 ("[The defendant] would be entitled to application of the 2000 guidelines if his last charged offense occurred before November 1, 2001, and the application as a whole of the 2000 guidelines would have resulted in a lesser sentence.").

The district court did not clearly err in finding Wright committed acts of abuse with J.L.C. after that date.[5]  J.L.C. testified that Wright raped him "five or six times," starting when he was about five or six years old and continuing "until [J.L.C.] was about 11."  J.L.C. turned eleven on December 9, 2001.  In Carter, we determined that

_____

[5]It is not disputed that the alleged abuse of T.L.C. and J.L.W. occurred before November 1, 2001.

the district court did not clearly err in determining an offense occurred after the effective date based on a victim's self-contradicting testimony about when sexual contact occurred. Id. We determined that "[a]lthough [the victim's] testimony was equivocal, we cannot conclude that, in the face of such testimony, the district court clearly erred in determining that the defendant perpetrated at least one of his offenses after the effective date of § 4B1.5(b)(1)." Id. Likewise, although the evidence in the instant case was equivocal, J.L.C. testified that the abuse continued until he was about eleven and that he turned eleven more than a month after the effective date of the guideline amendment. See id.; cf. United States v. Kilkenny, 493 F.3d 122, 128 (2d Cir. 2007) (finding an ex post facto violation when "[t]here is no evidence that any offensive conduct" took place after the effective date of the guideline amendments). Thus, the district court's conclusion to apply the five-level enhancement was not clearly erroneous.

ii.     Sentencing Enhancement for Custody, Care, or Supervisory Control

Wright argues the district court erred in finding that T.L.C., J.L.C., and J.L.W. were "in the custody, care, or supervisory control of" Wright, as is required for the two-level specific offense characteristic enhancement under USSG §2A3.1(b)(3)(A). According to the comments, this section "is to be construed broadly." USSG § 2A3.1, comment. (n.3). The enhancement applies even if the arrangement between the defendant and the minor is "peripheral or transitory custody," United States v. Kenyon, 481 F.3d 1054, 1072 (8th Cir. 2007) (quotation omitted), and it can apply even if there is no legal relationship between the parties, USSG § 2A3.1 comment. (n.3).

The district court's finding that the victims were in Wright's custody, care, or supervisory control is not clearly erroneous. Wright lived with the victims. Each of the victims testified they considered Wright to be a "big brother." Wright was

between fourteen and twenty-one years old during the relevant time periods, and the victims were between four and eleven years old. The victims' guardian left them alone in the house with Wright. T.L.C. testified that she was abused when she and her brothers were left alone with Wright. J.L.C. testified he did not think anyone else was in the house the first time he was abused.

The evidence indicates Wright was in control of the victims when their guardian was not at home. The district court did not clearly err in applying the enhancement. See United States v. Voice, 200 F.3d 584, 585 (8th Cir. 2000) (finding the district court did not clearly err in applying the enhancement, as the evidence "included testimony of the victim's mother and [the defendant's] companion that defendant and his companion were supposed to be babysitting the victim when the abusive contact occurred"); cf. United States v. Blue, 255 F.3d 609, 614 (8th Cir. 2001) (finding the district court clearly erred in applying the enhancement when the evidence showed only that the defendant "was in the bathroom, that the child entered the bathroom, and that the two were in the bathroom together for a short time" because this evidence "does not establish custody but only demonstrates proximity").

### iii. Fine

Wright also argues the district court erred in fining Wright $25,000 without making an assessment of his ability to pay the fine. "It is incorrect for a court to impose a fine that the defendant has little chance of paying. The defendant has the burden of proving that he cannot pay the fine." United States v. Berndt, 86 F.3d 803, 808 (8th Cir. 1996) (internal citation omitted).

Section 5E1.2(a) of the guidelines provides that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." In determining whether the defendant has

established his burden, the district court must consider "the [guideline] factors relevant to the particular case."[6] Berndt, 86 F.3d at 808.

The court found Wright did "not have the ability to pay interest" and waived interest payments. The court ordered a fine of $25,000. Defense counsel objected to the fine, stating Wright "is totally indigent and has no resources whatsoever to pay a fine." The presentence report supported this conclusion, stating Wright was unemployed, has been unemployed most of his life, has no assets, is in debt, and was living with a friend who was paying the household expenses at the time of his arrest. However, the court overruled the objection, explaining "[i]n light of the fact that he's sentenced to a life sentence and he'll be eligible for UNICOR and other prison programs, I believe that he does have the ability to pay a fine in that dollar amount . . . ." In ordering Wright to pay the fine, the district court considered the defendant's ability to pay and thus fined Wright at the low end of the guidelines. We do not find this was clearly erroneous. See id. (standing standard of review); cf. United States v. Granados, 962 F.2d 767, 774 (8th Cir. 1992) (finding the district court imposed a fine based solely on a conclusory statement in the presentence report and remanding for factual findings).

---

[6]The guideline factors used to determine the amount of a fine are:

(1) the need for the combined sentence to reflect the seriousness of the offense . . . , to promote respect for the law, to provide just punishment and to afford adequate deterrence; (2) any evidence presented as to the defendant's ability to pay the fine . . . ; (3) the burden that the fine places on the defendant . . . ; (4) any restitution or reparation that the defendant has made . . . ; (5) any collateral consequences of conviction . . . ; (6) whether the defendant previously has been fined for a similar offense; (7) the expected costs to the government . . . ; and (8) any other pertinent equitable considerations.

USSG § 5E1.2(d).

III.  Conclusion

We affirm the judgment of the district court.

_____