# United States Court of Appeals
## For the Eighth Circuit

_____

No. 12-2062

_____

United States of America

*Plaintiff - Appellee*

v.

Michael Seibel

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of South Dakota - Pierre

_____

Submitted: December 14, 2012
Filed: April 16, 2013

_____

Before WOLLMAN, BYE, and BENTON, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

A jury convicted Michael Seibel of two counts of sexual abuse of a minor, in violation of 18 U.S.C. §§ 1152, 2243(a), and 2246(2)(D), and two counts of abusive sexual contact, in violation of 18 U.S.C. §§ 1152, 2244(a)(3), and 2246(3) relating to the abuse of his adopted daughters, S.S. and P.S.  Seibel appeals from his

conviction, arguing that the district court[1] improperly excluded certain evidence, that the evidence presented was insufficient to support the verdict, and that a new trial should have been granted on the basis of newly discovered evidence. We affirm.

## I. Background

In 1997, Seibel and his wife, Cindy, began fostering three Native American siblings, S.S., a female approximately two years of age; M.S., a male approximately one and one-half years of age; and P.S., a female approximately eight months of age. These children had been placed into foster care after their biological father was arrested, charged, and eventually convicted of sexually abusing their three older siblings. See United States v. Magpie, 162 F.3d 1165 (8th Cir. 1998) (per curiam) (unpublished table decision). The biological father was never charged with abusing S.S., M.S., or P.S. Furthermore, when questioned whether there had been any allegations that the biological father had sexually abused either S.S. or P.S., the Bureau of Indian Affairs (BIA) criminal investigator who conducted the investigation in Magpie testified that to his recollection there were none.

In 2003, the Seibels formally adopted S.S., M.S., and P.S. The Seibels entered into subsidized adoption agreements with the South Dakota Department of Social Services (SDDSS), which had legal custody of the children. The adoption agreements extended coverage under South Dakota Medicaid in a provision labeled: "Preexisting Medical problems[.]" These "preexisting medical problems" included, among several others, problems arising from "sexual abuse of child" and "abused/neglected child." Although in the years following their adoption the children were in counseling for behavioral problems, the Seibels never sought coverage for counseling related to any preexisting physical or sexual abuse that the children may have suffered.

---

[1]The Honorable Charles B. Kornmann, United States District Judge for the District of South Dakota.

Furthermore, when asked whether she understood at the time of adoption that the children had been sexually abused, Cindy responded, "no," and that she "was just told that they were removed." July 25, 2011, Hearing Tr. 25-26.

Beginning in June 2008, Pat Poitra, a mental health therapist from Three Rivers Mental Health Home, began counseling the children for behavioral problems. In August 2009, Elisa Kelley of Three Rivers took over counseling S.S. and P.S. The counseling sessions would usually take place at the girls' school, although home visits also occurred on occasion. During P.S.'s December 6, 2010, counseling session, Kelley asked P.S. about her previous week, to which P.S. responded by telling Kelley that she had been physically abused by Seibel. P.S. then revealed several incidents of alleged physical abuse, but made no mention of any sexual abuse. Kelley filed a report with Child Protective Services and two days later an investigator from the BIA and the school's principal interviewed P.S. at the school. During the interview, P.S. discussed several incidents of physical abuse by Seibel. When asked whether Seibel ever sexually touched her, P.S. revealed that she had been subjected to sexual abuse as well.

Following this interview, the three children were removed from the Seibel home and placed at the Lake Oahe Group Home. S.S., who had given birth to a child of her own with her boyfriend, was then placed in a foster home because of problems between S.S. and P.S. at the group home. Shortly thereafter, S.S. left the foster home with her baby and was placed at New Beginnings. Because this facility did not permit S.S. to stay with her child, the child was placed in another foster home. As part of the investigation into P.S.'s allegations, S.S. was interviewed while at New Beginnings and disclosed that she too had been sexually abused by Seibel.

During the investigation into S.S.'s and P.S.'s allegations, law enforcement officers obtained consent from Cindy to search the Seibel home and then conducted the search accompanied by P.S. The officers took several pictures of P.S.'s room,

showing damage to a wall, which corroborated one of P.S.'s allegations. The pictures also showed that the room had been painted and thoroughly cleaned following P.S.'s removal from the home. The officers took the bedding from P.S.'s room and had it tested for DNA evidence. The test results revealed the presence of blood, semen, and other bodily fluids, all of which tested negative for Seibel's DNA.

Seibel was indicted on fourteen separate counts of sexual and physical abuse of S.S. and P.S. Prior to his trial, Seibel gave notice of his intent to introduce evidence under Federal Rule of Evidence 412 of S.S.'s and P.S.'s sexual abuse history at the hands of their biological father and of S.S.'s and P.S.'s consensual sexual activities. Following a hearing on Seibel's motion, the district court ruled that the evidence of prior sexual abuse was inadmissible under Rules 412 and 403 and that evidence of the discovery of semen on P.S.'s bedding would not be admitted. See D. Ct. Order of Aug. 5, 2011, at 8. The district court denied without prejudice evidence of the victims' sexual activities, offered to prove an alternative source of sexual knowledge. Id.

During the five-day jury trial, both S.S. and P.S. testified in detail regarding the sexual abuse by Seibel. Each acknowledged, however, that prior to trial she had recanted her allegations in some way. S.S.'s recantation occurred during a visit by her pastor, the Reverend Dennis Fonkert. While she was at New Beginnings, S.S. told Reverend Fonkert that Seibel never did any of the things that she had alleged he had done. Reverend Fonkert then relayed this information to Seibel's defense counsel, allegedly at S.S.'s request, an allegation that S.S. denied at trial. When asked at trial why she told Reverend Fonkert that Seibel had not touched her, S.S. replied that she did not want to tell him about the things that Seibel had done to her. She also reaffirmed that, notwithstanding her discussion with Reverend Fonkert, Seibel did sexually abuse her.

P.S. recanted during a discussion with the prosecutor and a counselor from the group home, saying that her previous allegations were untrue. When asked at trial why she had recanted, P.S. said that she wanted to go home and thought that by taking back what she had said, the "whole thing would go away." At trial, P.S. reaffirmed that Seibel did sexually abuse her and that her recantation was not true. Seibel testified that he had never sexually abused either S.S. or P.S.

At the close of the government's case-in-chief, Seibel moved for a judgment of acquittal, which was granted as to Count V of the indictment, but denied as to all other counts. At the close of all evidence, Seibel renewed his motion for acquittal on the remaining counts, which was granted as to original Count XIV of the indictment. The remaining twelve counts were submitted to the jury. The jury returned a verdict of guilty as to four of those counts and not guilty as to the remaining eight counts.

Shortly before sentencing, S.S. wrote a letter recanting her trial testimony and alleging that she was forced to lie by certain individuals involved in the investigation and prosecution of Seibel. This letter was addressed to the district court, but was mailed to Cindy. Cindy then turned the letter over to defense counsel, who presented it to the government and the district court on the morning of Seibel's sentencing hearing. Seibel subsequently moved for a new trial under Federal Rule of Criminal Procedure 33. The district court held two hearings regarding the motion. S.S. testified at one of the hearings that she had written her recantation letter out of frustration and that the statements in the letter were not true. She again reaffirmed, under oath, that Seibel did sexually abuse her. The district court also heard evidence in the form of testimony and transcripts of taped telephone conversations between Seibel and Cindy that took place while Seibel was being confined in the Hughes County Jail which indicated that S.S. was under pressure from her family to recant and change her story. The district court found that the recantation letter was not credible and denied the motion for a new trial. See D. Ct. Order of Jan. 24, 2012.

## II. Discussion

A. Motion for Admission of Evidence Under Rule 412

Seibel contends that the district court erred by excluding under Federal Rules of Evidence 403 and 412 evidence of the victims' sexual and physical abuse history and their prior adolescent sexual experiences. "We review a district court's interpretation and application of the rules of evidence de novo and its evidentiary rulings for abuse of discretion." United States v. Street, 531 F.3d 703, 708 (8th Cir. 2008). "However, we review evidentiary rulings de novo when they implicate constitutional rights." United States v. Pumpkin Seed, 572 F.3d 552, 558 (8th Cir. 2009).

In a criminal proceeding, Rule 412 prohibits the admission of evidence involving alleged sexual misconduct offered to prove a victim's sexual predisposition or that the victim engaged in other sexual behavior. Fed. R. Evid. 412(a), (b). Notwithstanding that general prohibition, a court may admit the following evidence in a criminal case:

> (A) evidence of specific instances of a victim's sexual behavior, if offered to prove that someone other than the defendant was the source of semen, injury, or other physical evidence;
> . . . .
> (C) evidence whose exclusion would violate the defendant's constitutional rights.

Fed. R. Evid. 412(b)(1)(A), (C).

Seibel first argues that the exclusion of evidence regarding S.S.'s and P.S.'s earlier sexual abuse violated his rights under the Confrontation Clause, and was thus admissible under Rule 412(b)(1)(C). At the Rule 412 hearing, Seibel sought to

introduce evidence that S.S. and P.S. had been physically and sexually abused by their biological father. This evidence consisted of their biological father's conviction for sexually abusing their three older siblings and the above-described provision in the subsidized adoption agreements entered into by SDDSS and the Seibels extending medicaid coverage for preexisting medical conditions, which included "sexual abuse" and "abused/neglected child."

The district court concluded that "there is no evidence to support the contention that the alleged victims were in fact sexually abused by their biological father[,]" and that the adoption agreements were "nothing but unsupported speculation by some unknown employee of the SDDSS." D. Ct. Order of Aug. 5, 2011, at 7. The district court also ruled that the proffered evidence was "not admissible under either Rule 412(b)(1)(A) or (C) and in any event would be excluded under Rule 403." Id. at 8. Regarding Rule 403, the district court held that the "evidence that the alleged victims may have been sexually abused by their biological father when they were infants . . . 'is too weak to justify the admission of this highly prejudicial evidence.'" Id. at 7 (quoting Pumpkin Seed, 572 F.3d at 558). We conclude that the district court did not abuse its discretion in concluding that the probative value of this proffered evidence was substantially outweighed by its potential unfair prejudice. In light of the district court's Rule 403 ruling, we need not reach its Rule 412 ruling. See United States v. Frederick, 683 F.3d 913, 919 (8th Cir. 2012).

Seibel argues next that the district court erred by excluding any evidence of semen discovered on P.S.'s bedding. The district court found that because the semen was not Seibel's it was "immaterial and will not be admitted [and] . . . [i]f nothing else, it is barred by Rule 403." D. Ct. Order of Aug. 5, 2011, at 4. Seibel appears to argue that this evidence was admissible to demonstrate that P.S. was misleading the authorities and to demonstrate that Seibel was not the source of the semen discovered on the bedding. We find neither argument persuasive.

Seibel has pointed to no evidence that indicates that P.S. directed law enforcement to seize or test any items at the house. At trial, she specifically denied telling law enforcement which items should be taken and tested. Seibel has thus failed to demonstrate that the negative test results are probative of P.S.'s lack of credibility. The government did not introduce this evidence at trial or allege that Seibel was the source of any bodily fluids discovered on the bedding in question. There was thus no need for Seibel to prove that someone other than himself was the source of the physical evidence. See United States v. Tail, 459 F.3d 854, 859 (8th Cir. 2006) ("The government did not introduce evidence of J.H.'s Hepatitis B, so Tail's negative test results cannot rebut an inference that he was the cause of her disease."). Accordingly, the district court did not abuse its discretion in excluding evidence of the presence of semen on P.S.'s bedding.

Notwithstanding the district court's ruling, Seibel was able to elicit testimony at trial that the bedding was tested and that there was no evidence that Seibel's blood, semen, bodily fluids, or DNA were found on the bedding. We recognize that "[a] restriction on an accused's right to introduce evidence may not be arbitrary or disproportionate to the purpose that the restriction is designed to serve[.]" United States v. Papakee, 573 F.3d 569, 573 (8th Cir. 2009). We conclude, however, that the district court's restriction in this case was appropriate because "Rule 412 serves important purposes of preventing harassment or embarrassment of sexual abuse victims, and the proffered evidence was of little or no probative value." Id. The district court's decision to admit the negative test results of the bedding, but exclude the evidence that another individual's semen was found, was neither arbitrary nor disproportionate to the purpose that Rule 412 was designed to serve, and thus there was no error.

Seibel also sought to introduce evidence that the victims had acquired sexual knowledge from someone other than himself by engaging in sexual intercourse with other persons, including specifically that S.S. had conceived a child that DNA

evidence determined was not Seibel's.[2]  On this issue, the district court held that "[t]here is no evidence on the current record . . . that the alleged victims possess sexual knowledge beyond their years[,]" and thus denied this portion of Seibel's motion without prejudice, allowing him "to renew the proffer of evidence in camera during trial." D. Ct. Order of Aug. 5, 2011, at 8.  "In order to challenge a trial court's exclusion of evidence, . . . an attorney must preserve the issue for appeal by making an offer of proof. . . .  Even if an issue is raised pre-trial, . . . an attorney must make an offer of proof during the trial in order to preserve the issue for appeal." United States v. Kirkie, 261 F.3d 761, 767 (8th Cir. 2001) (internal citations omitted).  Seibel made no such offer of proof at trial on this issue and  "[b]ecause there [was] no offer of proof nor a request to make such an offer on the record, the issue was not properly preserved for appeal, and we cannot find that the trial court abused its discretion." Id.

Seibel contends further that the district court abused its discretion in precluding him from cross-examining S.S. regarding the government's alleged coercive method of keeping S.S. from her child so as to force her to testify against him and in precluding Cindy from testifying about the victims acting out in a sexual manner when they first came to the Seibel home.  It is unclear if either of these issues was raised below, but to the extent they were raised, there were no offers of proof at trial and they were not properly preserved for appeal.  Accordingly, we cannot find that the district court abused its discretion in precluding this evidence.

_____

[2]To the extent Seibel contends that he should have been able to introduce evidence that the child was not his, we conclude that the district court did not abuse its discretion. Although the child was twice referred to in violation of the district court's order prohibiting any such reference, both references occurred during defense counsel's questioning of defense witnesses.  Moreover, one of the references was struck from the record and the other was made by the child's father, wherein he acknowledged that the child was his.  Thus, there was nothing for Seibel to rebut under Rule 412(b)(1)(A). See Tail, 459 F.3d at 859.

B. Motion for Judgment of Acquittal

Seibel contends that the district court erred in denying his motion for judgment of acquittal based upon insufficiency of the evidence. "In reviewing the denial of a motion for judgment of acquittal based on insufficiency of the evidence, we consider the evidence in the light most favorable to the verdict and reverse only if no rational fact finder could have found the defendant guilty beyond a reasonable doubt." Kirkie, 261 F.3d at 768.

Seibel does not dispute that the jury heard evidence in the form of S.S.'s and P.S.'s testimony which, if believed, would establish each of the essential elements for a conviction for sexual abuse of a minor under 18 U.S.C. §§ 1152, 2243(a), and 2246(2)(D), and for a conviction for sexual contact with a minor under 18 U.S.C. §§ 1152, 2244(a)(3), and 2246(3). Instead, Seibel contends that no reasonable jury could have found this testimony credible. In support of his attack on the credibility of S.S. and P.S., Seibel argues that the jury was aware that both victims had recanted their stories at one time prior to trial, that both victims had a reputation for dishonesty in the community, and that both victims' testimony contained certain inconsistencies. Seibel notes that the jury must have found S.S. less than fully credible because it acquitted Seibel of many of the charges against him, even in the face of testimony by S.S. which, if believed, would have established the necessary elements for a conviction under those counts. Seibel argues further that the government presented no physical evidence of rape, molestation, or sexual abuse.

"Questions of credibility are the province of the jury." United States v. Chavez, 230 F.3d 1089, 1091 (8th Cir. 2000). "In ruling on a motion for acquittal, a trial court must determine whether sufficient evidence was presented to support a verdict without considering the weight of such evidence or its credibility. A trial court has neither the duty nor the authority to grant a motion for acquittal based on the credibility of a witness." Kirkie, 261 F.3d at 768 (internal citations omitted). The

-10-

district court thus did not err in denying the motion for acquittal based upon the credibility of S.S.'s and P.S.'s testimony at trial. See id.; United States v. Wright, 119 F.3d 630, 633-34 (8th Cir. 1997); see also United States v. McKinney, 88 F.3d 551, 555 (8th Cir. 1996) ("It is not necessary for a jury to reach consistent verdicts on two counts of an indictment."), *overruled on other grounds by* United States v. LeBrun, 363 F.3d 715 (8th Cir. 2004).

Nor does the lack of physical evidence warrant overturning Seibel's conviction. "Even in the face of inconsistent evidence, a victim's testimony alone can be sufficient to support a guilty verdict." United States v. Kenyon, 397 F.3d 1071, 1076 (8th Cir. 2005); see also Kirkie, 261 F.3d at 768 (concluding that a lack of physical evidence did not demonstrate insufficient evidence because "[e]ven if the jury relied only on the testimony of the victim herself, there would be sufficient evidence to support the convictions"). Because S.S.'s and P.S.'s testimony is sufficient to support Seibel's convictions, the district court did not err in denying Seibel's motion for acquittal based upon a lack of physical evidence.

C. Motion for New Trial

Seibel contends that the district court abused its discretion in denying his motion for a new trial based upon S.S.'s recantation letter. "[I]n reviewing decisions by district courts on motions for new trial, our scope of review is narrow. We must affirm unless there has been an abuse of discretion." United States v. Grey Bear, 116 F.3d 349, 350 (8th Cir. 1997). Motions for a new trial based upon the recantation of a material witness are viewed with disfavor because "[t]he stability and finality of verdicts would be greatly disturbed if courts were too ready to entertain testimony from witnesses who have changed their minds, or who claim to have lied at the trial." Id. "This skepticism is especially applicable in cases of child sexual abuse where recantation is a recurring phenomenon, particularly when family members are involved and the child has feelings of guilt or the family members seek to influence

the child to change her story." United States v. Rouse, 410 F.3d 1005, 1009 (8th Cir. 2005) (internal quotation marks omitted).

"To receive a new trial a movant must show, among other things, that the newly discovered evidence is of such a nature that, in a new trial, the newly discovered evidence would probably produce an acquittal." United States v. Papajohn, 212 F.3d 1112, 1118 (8th Cir. 2000) (internal quotation marks omitted), *abrogated on other grounds by* Crawford v. Washington, 541 U.S. 36 (2004). "When the claim of newly discovered evidence is based on a recantation, the district court must first determine whether the recantation is credible." Rouse, 410 F.3d at 1009. In reaching this determination, "[t]he real question . . . is not whether the district judge believed the recantation, but how likely the district judge thought a jury at a second trial would be to believe it." Grey Bear, 116 F.3d at 350. We accord the district court's credibility finding extreme deference and will reverse only upon a showing of clear error. Rouse, 410 F.3d at 1008.

The district court heard testimony in two separate hearings regarding the letter and reviewed digital copies and transcripts of the recorded jailhouse telephone conversations between Seibel and Cindy described above. After considering all of this evidence, the district court denied the motion for a new trial, "find[ing] that the October 27, 2011, recantation [was] not credible." D. Ct. Order of Jan. 24, 2012, at 2. Rather, the district court found that it was "caused by [S.S.'s] desire to be reunited with her baby and sister and to return to their home" and "was instigated by defendant and his wife." Id. The district court concluded also that even if the letter were admitted at a second trial, the evidence would not "probably produce an acquittal." Id. at 2-3.

Although Seibel contends that the district court abused its discretion in concluding that the newly discovered recantation letter would not probably produce an acquittal, he has not challenged the district court's finding that the recantation

letter is not credible. The record reveals that although S.S. did author the recantation letter, she testified that she wrote the letter out of frustration; that contrary to the letter, she was not afraid of the individuals alleged to have forced and threatened her to lie about her father; that her trial testimony was in fact true; and that Seibel did sexually abuse her. The district court also heard uncontroverted testimony from the various individuals named in the letter that they never forced or threatened S.S. to lie about being abused by Seibel. The district court considered transcripts of recorded telephone conversations between Seibel and Cindy, during which they discussed the need to have S.S. submit a letter to the district court recanting her allegations, accusing the prosecution and law enforcement of forcing her to testify falsely, and discussing how she feared those individuals. Moreover, the district court heard testimony that on multiple occasions following private conversations between S.S. and Cindy, S.S. would state that she needed to take back what she said about Seibel or the family would lose its house and she would never see her daughter again.

In light of the testimony and exhibits presented, the district court did not clearly err in finding that S.S.'s recantation was not credible and was instigated by Seibel and Cindy. Considering the lack of credibility of the newly discovered evidence and the evidence that was presented at trial, we conclude that the district court did not abuse its discretion in denying the motion for a new trial.

## III. Conclusion

The conviction is affirmed.

_____

-13-