# United States Court of Appeals
### For the Eighth Circuit

_____

No. 14-1770

_____

United States of America

*Plaintiff - Appellee*

v.

Mohammed Sharif Alaboudi

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of South Dakota - Sioux Falls

_____

Submitted: February 12, 2015
Filed: May 28, 2015

_____

Before GRUENDER, SHEPHERD, and KELLY, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Following a jury trial, Mohammed Alaboudi was convicted of conspiracy to engage in sex trafficking of a child, sex trafficking of a child, and sex trafficking by

means of force, fraud, or coercion.[1] The district court[2] issued a life sentence for each count, all running concurrently. Alaboudi appeals his conviction and sentence, arguing the government's conduct during his trial deprived him of a fair trial, the evidence was insufficient to sustain his conviction, and the imposition of four life sentences violates his Eighth Amendment rights. We affirm Alaboudi's conviction and sentence.

## I. Background

"Consistent with our standard of review, the following facts are described in the light most favorable to the verdict." United States v. Garcia, 521 F.3d 898, 899 (8th Cir. 2008). Between September 2011 and May 2012, Alaboudi convinced and coerced four women—two minors, S.J. and J.W., and two adults, N.T. and M.M.—to engage in commercial sex transactions in his apartment in Sioux Falls, South Dakota.

S.J. met Alaboudi through his co-conspirator, Emmanuel Nyuon, when she was 14 years old. Nyuon and S.J. met around September 2011 and started a sexual relationship. At that time, S.J. was living with her mother and was not attending school because she had been expelled. Nyuon began bringing S.J. to Alaboudi's apartment around November 2011, and the two men convinced S.J. to engage in commercial sex transactions on multiple occasions in Alaboudi's apartment. S.J. split the proceeds of the transactions with Nyuon and Alaboudi. The men provided S.J. with alcohol, drugs, and cigarettes. S.J. was afraid of Alaboudi and witnessed him act violently, including one incident where he beat potential customers with a piece of

---

[1]On Counts 2 to 4, Alaboudi was convicted of sex trafficking or aiding and abetting sex trafficking, in violation of 18 U.S.C. § 2(a)-(b). Aiding and abetting is not relevant to this appeal.

[2]The Honorable Karen E. Schreier, United States District Judge for the District of South Dakota.

wood because they did not have the money they had promised. In January 2012, S.J. ran away from home and began staying with Nyuon, who advertised her as a prostitute online and continued to arrange for her to engage in commercial sex transactions at Alaboudi's apartment and in other locations. On one visit to Alaboudi's apartment, Nyuon asked S.J. if she would have sex with Alaboudi, and after she said no at least three times, Alaboudi raped her. Law enforcement found S.J. by discovering her advertisement on a commercial sex website and conducting a sting operation.

J.W.'s sisters introduced her to Alaboudi after she ran away from home in November 2011 at age 15. When J.W. met Alaboudi, she had no money or place to stay and was looking for drugs. J.W. and one of her sisters discussed J.W.'s age in front of Alaboudi. Alaboudi talked to J.W. about having sex for money but told her that her sisters were "bad in bed" and he wanted to "taste" her first before setting up any transactions. Alaboudi had sex with J.W. and arranged for her to engage in commercial sex transactions with a number of men in his home, keeping the money for himself and giving her a place to stay, alcohol, and drugs. J.W. stayed with Alaboudi for about a week before her father came to take her home.

N.T., J.W.'s older sister, moved to Sioux Falls to stay with her sisters after losing custody of her five children. She met Alaboudi through one of her sisters, who took N.T. to Alaboudi's to drink alcohol. At the time, N.T. was using alcohol, hair spray, and methamphetamine. N.T. had a hard time remembering dates, but told interviewers that around November or December 2011, she had a fight with her sister and moved in with Alaboudi. Alaboudi provided N.T. with alcohol and drugs. He demanded she have sex with him and with other men for money and kept most of the money for himself. Alaboudi physically abused N.T. on a number of occasions, threatening her with a knife, kicking her, and hitting her with his hands and a wooden chair leg with a screw sticking out of it. N.T. also witnessed Alaboudi act violently toward other women. When N.T. found another place to stay and tried to leave

Alaboudi's, he grabbed her and began hitting her, and she was only able to leave after another person restrained him.

M.M. met Alaboudi through her ex-boyfriend in spring 2011. M.M. started going to Alaboudi's apartment for parties, and when she and her sister became homeless, they began staying at Alaboudi's off and on. Alaboudi provided them with clothes, alcohol, and drugs. Alaboudi threatened and abused M.M. and her sister, telling the sister he would kill her unless she had sex with him, beating M.M. with nunchucks when she tried to protect her sister, punching M.M. in the face, and threatening to kill M.M. when she did not do what he wanted. Alaboudi and M.M.'s ex-boyfriend convinced M.M. to engage in commercial sex transactions on at least two occasions. Alaboudi also tried to coerce M.M.'s sister to engage in commercial sex by threatening her, beating her, and telling her she owed him for the alcohol, drugs, and cigarettes he provided.

Law enforcement officials identified Nyuon through S.J. Their investigation led them to Alaboudi, who they interviewed in February and October 2012. In those interviews, Alaboudi confirmed he dated N.T. and that Nyuon, who Alaboudi called a "pimp," had brought S.J. to his apartment. He said he hosted lots of parties, used drugs, and provided drugs in exchange for sex with many of the women who came to his apartment. Federal agents executed a search warrant on Alaboudi's apartment in October 2012. They found condoms, feminine hygiene products and makeup, women's clothing in varying sizes, drug paraphernalia, drugs, and a large stick with black electrical tape around one end. Alaboudi was charged with one count of conspiracy to engage in sex trafficking of a child, in violation of 18 U.S.C. §§ 1591(a)(1) and 1594(c); one count of sex trafficking of a child, in violation of 18 U.S.C. § 1591(a)(1)-(2), (b)(1)-(2), and (c); and two counts of sex trafficking by means of force, fraud, or coercion, in violation of 18 U.S.C. § 1591(a)(1)-(2) and (b)(1).

At trial, S.J., J.W., N.T., and M.M. all provided detailed testimony about their encounters with Alaboudi. A number of other witnesses also testified and corroborated the women's accounts. Several witnesses confirmed that S.J. was at Alaboudi's with Nyuon and described what they saw happen to her. One of Alaboudi's customers testified that he paid for sex with S.J. and other women in Alaboudi's apartment. Another man testified that Alaboudi gave him a stick with black tape on it and nails in one end and asked him to beat someone with it in exchange for drugs. Alaboudi testified and confirmed he knew all four victims. He also told about an occasion where he beat another man with a stick because he was mad at him. Alaboudi called an FBI forensic interviewer, Stephanie Knapp, who had interviewed S.J. and M.M., to testify about inconsistencies in the accounts the women gave of their experiences. The defense questioned the victims about inconsistencies in their stories and highlighted problems with their credibility and memory, particularly relating to alcohol and drug use.

The jury returned a guilty verdict on all four counts. The district court sentenced Alaboudi to four life sentences, all running concurrently. Alaboudi now appeals, arguing: (1) the government violated two pretrial orders and made improper comments during closing arguments, which constituted prosecutorial misconduct and denied Alaboudi his right to a fair trial; (2) the evidence was insufficient to sustain his conviction; and (3) the imposition of four life sentences violates his Eighth Amendment rights.

## II. Discussion

### A. Prosecutorial Misconduct

Alaboudi argues that a number of government actions during the trial were improper and constituted prosecutorial misconduct. He argues the government violated two pretrial orders in its cross-examination of a lay defense witness,

Stephanie Knapp, and compounded the prejudice by revisiting the improper testimony during closing arguments and referring to Knapp as an "expert." Alaboudi also argues the government made a number of comments during closing arguments that improperly appealed to the jurors' emotions. He contends these acts, individually and cumulatively, operated to deprive him of his right to a fair trial.

"Prosecutorial misconduct can result in the reversal of a conviction if (1) the prosecutor's conduct or remarks were improper, and (2) the conduct or remarks prejudicially affected the defendant's substantial rights by depriving the defendant of a fair trial." United States v. Davis, 534 F.3d 903, 914 (8th Cir. 2008). Alaboudi objected to some of the alleged misconduct during closing arguments, which we review for an abuse of discretion. See id. We review the conduct Alaboudi did not object to "only for plain error and reverse only under exceptional circumstances."[3] See id. Under plain error review, Alaboudi must show there was an error that was clear, prejudicial, and affected the trial's outcome. See id.; United States v. Foreman,

---

[3]Alaboudi asks this court to apply an abuse of discretion standard to the prosecutor's alleged violations of the pretrial orders, arguing he preserved his claims by filing the motions in limine. See Fed. R. Evid. 103(b) ("Once the court rules definitively on the record—either before or at trial—a party need not renew an objection or offer of proof to preserve a claim of error for appeal."). We disagree in this case, as the district court granted Alaboudi's pretrial motions to limit testimony and thus the errors, if any, occurred only when the government violated the orders during trial. See Fed. R. Evid. 103 advisory committee's note (2000 amend.) ("[I]f the opposing party violates the terms of the initial ruling, objection must be made when the evidence is offered to preserve the claim of error for appeal. The error, if any, in such a situation occurs only when the evidence is offered and admitted."). Alaboudi did not alert the district court to alleged violations of the orders to give the court an opportunity to correct any error. Thus we review only for plain error. See United States v. Samples, 456 F.3d 875, 882 (8th Cir. 2006) (applying plain error review where defendant did not object to government's line of inquiry but claimed on appeal it violated a pretrial order); cf. United States v. Big Eagle, 702 F.3d 1125, 1131 (8th Cir. 2013) ("Because no objection was made, the district court was not called upon to exercise its discretion. Therefore, our review is limited to plain error.").

588 F.3d 1159, 1164 (8th Cir. 2009). "The plain error rule is designed to correct only 'those errors that seriously affect the fairness, integrity or public reputation of judicial proceedings.'" United States v. Wadlington, 233 F.3d 1067, 1079 (8th Cir. 2000) (quoting United States v. Young, 470 U.S. 1, 15 (1985)) (internal quotation marks omitted). Under either standard of review, "'[f]actors to consider in assessing prejudice include the cumulative effect of any misconduct, the strength of the properly admitted evidence, and any curative actions taken by the trial court.'" Foreman, 588 F.3d at 1164 (quoting United States v. McClellon, 578 F.3d 846, 859 (8th Cir. 2009)) (plain error); accord Wadlington, 233 F.3d at 1077 (abuse of discretion).

Prior to trial, Alaboudi filed a motion in limine regarding opinion testimony, which asked the district court to direct the government "to refrain absolutely from soliciting opinion testimony from its witnesses" and to instruct its witnesses not to make "any direct or indirect reference to any opinions, as to modes of operation or common characteristics relative to prostitution" without a hearing. At a pretrial hearing, the government noted it did not have expert testimony but objected to the motion "[a]s far as any law enforcement testimony about what they encounter in these type of cases." Alaboudi's attorney explained that the motion was directed to lay witnesses, including law enforcement, and sought to eliminate conclusory statements such as "I observed prostitution" rather than descriptions like "[t]hey exchanged cash for sex." The district court granted the motion as to all witnesses, stating "[i]f law enforcement intends to give testimony like that, you need to give notice of them being an expert witness, so that I can have a hearing outside of the presence of the jury." Alaboudi filed a second motion in limine regarding victim terminology, which asked the district court to direct the government "to refrain absolutely from making any direct or indirect reference whatsoever," and to instruct their witnesses to also refrain "from making any direct or indirect reference whatsoever to the term 'victim' when referring to Child Victim #1 [S.J.], Child Victim #2 [J.W.], N.T. or M.M." The government did not object to the motion and the district court granted it.

Alaboudi argues that the government violated both pretrial motions during its cross-examination of a defense witness, FBI forensic interviewer Stephanie Knapp. Alaboudi called Knapp as a lay witness to testify about her interviews with S.J. and M.M., specifically regarding inconsistencies in the accounts the women gave of their experiences with Alaboudi and commercial sex. On cross-examination, the government asked Knapp about her experience conducting sex trafficking interviews and asked her to describe "why these interviews are different than other type [sic] of victim interviews." Knapp answered that "the victimization is different" and "tends to be – victimization that is compiled with trauma over trauma over trauma." She explained that she often has to meet with these individuals multiple times because "this type of victimization is very difficult for them to come forward to discuss their own victimization" and many of these individuals are embarrassed and afraid and may not have had positive experiences with law enforcement. Alaboudi did not object to this testimony. During closing arguments, the government reminded the jury of Knapp's testimony, specifically her explanation of why "it is so hard to get these girls to talk about these things." Alaboudi did not object. During its rebuttal closing argument, the government referred to Knapp as "a forensic expert," which Alaboudi objected to as "facts not in evidence" because Knapp "was a lay witness." The district court did not clearly rule on the objection but instructed the jury to "rely on [their] recollection of what Miss Knapp testified about. Those are the facts that you will find are the ones that you remember." Alaboudi did not request additional relief or move for a mistrial. He now argues that Knapp testified about "what [she] encounter[s] in these type of cases," in direct contravention of the district court's order on opinion testimony, and that the government effectively turned Knapp into an expert witness and relied on her testimony to explain all the inconsistencies in the victims' testimony. He also argues the government's one use of the word "victim" and Knapp's repeated use of "victims" and "victimization" violated the district court's pretrial order on victim terminology.

This testimony may have violated the district court's pretrial order on opinion testimony. Knapp's testimony about her experiences interviewing sex trafficking victims could be construed as testimony on the "common characteristics relative to prostitution" that Alaboudi described in his motion, though Alaboudi did not object and give the district court an opportunity to decide the issue. Alaboudi did object to the government's reference to Knapp as an "expert," but his objection did not alert the district court to any possible violation of the pretrial order, and he did not request additional relief after the district court cautioned the jury to rely on its recollection of Knapp's testimony. Even assuming the government's conduct was improper, however, we find that Alaboudi has failed to show the requisite prejudice. Knapp was a defense witness specifically called to testify about inconsistencies in some of the victims' statements during interviews she conducted. The testimony the prosecutor elicited sought to explain these inconsistencies. By briefly returning to Knapp's testimony in closing arguments, the prosecutor reiterated evidence that the district court admitted without objection from the defense and that was responsive to the defense's attack on the victims' credibility. Cf. United States v. Grauer, 701 F.3d 318, 323 (8th Cir. 2012) ("In closing argument, 'a prosecutor is entitled to make a fair response and rebuttal when the defense attacks the government's case.'" (quoting United States v. Ziesman, 409 F.3d 941, 954 (8th Cir. 2005))); Wadlington, 233 F.3d at 1080 (though "two wrongs do not make a right," prosecutor's improper comments, viewed in the context of the entire trial, did not warrant reversal, largely because they were an attempt to respond to the defense's attack on the government's case).

Furthermore, the properly admitted evidence of Alaboudi's guilt was strong, including extensive testimony from all four victims, who largely corroborated each other's accounts; detailed testimony from other fact witnesses, including one of Alaboudi's repeat customers; and corroborating evidence obtained from a lawful search of Alaboudi's apartment. When the evidence of guilt is strong, it is less likely that an improper argument affected the outcome. See United States v. Darden, 688 F.3d 382, 390 (8th Cir. 2012) ("The wealth of evidence of [defendant's] guilt on the

counts of conviction indicates that the result at trial would not have been different absent the prosecutor's rebuttal comments."), cert. denied, 133 S. Ct. 2817 (2013). Alaboudi's counsel questioned the victims about inconsistencies in their statements and testimony, and the jury heard them explain why they may have given differing accounts or could not remember specific dates or events. The jury received ample evidence from which it could draw conclusions about what occurred and make its own credibility determinations, even without Knapp's testimony. Cf. United States v. Bentley, 561 F.3d 803, 811 (8th Cir. 2009) (finding no plain error where the evidence of guilt was strong "and there [was] no reasonable probability that the verdict would have changed without [the challenged] remarks"). And we do not believe the district court erred in failing to take curative action Alaboudi did not request or in failing to grant a mistrial sua sponte. See United States v. Big Eagle, 702 F.3d 1125, 1132 (8th Cir. 2013) ("We prefer not to order a new trial where the defendant failed to raise the issue of a mistrial before the district court.").

We also find harmless any violation of the district court's pretrial order on victim terminology. Given the generalized nature of the government's and Knapp's use of the words "victim" and "victimization," and the fact that Knapp was a defense witness, not a government witness, it is not clear the district court would have found these instances violated the pretrial order even if Alaboudi had objected. But assuming use of these words did violate the order, those violations would not require reversal. The cumulative effect of the references was minimal, as they were limited to a few instances in a generalized discussion of Knapp's experiences. See United States v. Samples, 456 F.3d 875, 883 (8th Cir. 2006) (finding minimal cumulative effect where remarks were confined to a few sentences and "were neither pronounced nor persistent"). Alaboudi's motion explained his concern that use of the word "victim" would decide the ultimate issue of Alaboudi's guilt for the jury, but given all of the evidence presented over the course of the four-day trial, these limited references cannot be said to have had that effect. See id. at 882-83 (finding that as the jury heard extensive evidence of defendant's mental state over the course of the trial, it was

unlikely that a few challenged remarks on that issue, though possibly violative of a pretrial order, "would have caused the jury to reach its verdict on an improper basis"). And again, we do not find the district court erred in failing to take curative action where Alaboudi did not request it.

Alaboudi also claims a number of statements the government made during closing arguments were inflammatory pleas to the jurors' emotions. Alaboudi argues the government made improper comments in its rebuttal argument, namely that the jury was "the only jury that gets to speak for each of those girls that came before you this [sic] past few days"; that if they did not find Alaboudi guilty, they would not "get another chance at this" or "another chance to change your mind"; and that "[t]he girls that are affected by this, that came before you need people like you to sit on this kind of jury, to stand up for them." The district court sustained objections Alaboudi raised to those comments. Alaboudi did not request additional relief or move for a mistrial. Alaboudi also points to comments in the prosecutor's closing argument that he claims improperly appealed to the jurors' sense of communal responsibility by intimating that the system had failed Alaboudi's victims and that the jurors were the only ones with the power to mend the system's failures. After walking through the law relevant to each count, the prosecutor stated, "Folks, as you think about all the evidence that you've heard, let's admit something, and that's that there are cracks in our community for girls to fall through. There were signs that something bad was going on in that house up the street and it took too long. And there are moments when things might have been different." He reminded the jury of the circumstances that had made S.J. vulnerable and stated that the fact that she was expelled from school and left without much guidance was "a failure in the system" and "a hole in the safety net." He also reminded the jury that the government granted Alaboudi asylum and gave him disability and housing benefits and that Alaboudi was interviewed in February 2012 but let go, after which he "went out and did more." After recapping more of the evidence, the prosecutor noted, "We can't turn back the clock and we can't convince these girls not to walk up those flights of stairs into that apartment with this man. We

-11-

can't erase it all. But the 12 of you who deliberate in this case have the ability to bring justice for what happened here." He then concluded, "Please, folks, consider all the evidence, consider all the instructions on the law, and render your verdict accordingly." Alaboudi did not object to any of these comments.

We find no plain error in the government's closing arguments. "A prosecutor should not urge a jury to convict for reasons other than the evidence; arguments intended to inflame juror emotions or implying that the jury's decision could help solve a social problem are inappropriate." United States v. Tulk, 171 F.3d 596, 599 (8th Cir. 1999). In the context of the government's closing arguments in this case, we do not condone the government's comments that the jurors were the only ones who could "speak for" or "stand up for" the victims. Cf. United States v. Rodriguez, 581 F.3d 775, 803 (8th Cir. 2009) (it is improper for the prosecutor to claim she can "speak for" the victim if, "in the context of surrounding statements, the comment appeals excessively to jurors' emotions"). And while the prosecutor's "community conscience" argument permissibly reminded the jury of the facts in this case and the harm to their community, we question the relevance of reminding the jury that Alaboudi was granted asylum and received government benefits in a discussion of "moments when things might have been different." See United States v. Sanchez-Garcia, 685 F.3d 745, 753 (8th Cir. 2012) ("'Unless calculated to inflame, an appeal to the jury to act as the conscience of the community is not impermissible.'" (quoting United States v. Lewis, 547 F.2d 1030, 1037 (8th Cir. 1976))), cert. denied, 133 S. Ct. 2046 (2013); United States v. Katz, 445 F.3d 1023, 1033-34 (8th Cir. 2006) (finding comments improper where they "'had little or no probative value on any issue at trial,'" "'did not relate to an element of the offense,'" and did not "'aid the fact finder'" (quoting United States v. Conrad, 320 F.3d 851, 855 (8th Cir. 2003))).

Ultimately, though, Alaboudi has not shown he was prejudiced. The government presented overwhelming evidence of Alaboudi's guilt over the course of a four-day trial. The district court instructed the jury that statements by the attorneys

were not evidence and it should base its decision on the evidence presented at trial. The government's closing arguments overall focused on the evidence presented in the case. The district court sustained Alaboudi's objections when he raised them, and he did not request additional relief or move for a mistrial. We do not find these comments warrant reversal.

Finally, we consider whether the cumulative effect of the government's misconduct denied Alaboudi a fair trial. See Wadlington, 233 F.3d at 1080 ("Because the cumulative effect of prosecutorial misconduct must be assessed in determining whether the defendant was prejudiced, a finding that each particular instance of misconduct was harmless does not end the inquiry."). After carefully reviewing the entire record, we conclude it did not. The testimony Alaboudi challenges was one limited portion of cross-examination of one witness during a four-day trial. The government referenced that testimony only briefly in its closing argument, which focused on the ample properly admitted evidence of Alaboudi's guilt. The district court sustained objections when Alaboudi raised them during the government's closing arguments, and while some of the prosecutor's comments were questionable, they were limited references in the context of a closing argument that focused overall on the strong evidence against Alaboudi. Alaboudi did not request limiting instructions or move for a mistrial. We find no abuse of discretion or plain error that denied Alaboudi of a fair trial. See id. (cumulative effect of conduct did not deprive defendant of a fair trial where challenged comments occurred at different points over a six-day trial, government presented ample evidence against defendant, and district court issued limiting instructions where requested).

## B. Sufficiency of the Evidence

Generally, "'we review the sufficiency of the evidence *de novo*, evaluating the evidence in the light most favorable to the verdict and drawing all reasonable inferences in its favor.'" United States v. Thunder, 745 F.3d 870, 874 (8th Cir. 2014) (quoting United States v. Wright, 739 F.3d 1160, 1167 (8th Cir. 2014)). Alaboudi moved for judgment of acquittal at trial, arguing the government failed to establish the

required elements as to each of the four counts. On appeal, though, he does not dispute that the jury heard evidence that, if believed, would establish each of the elements required to support his convictions. Rather he argues only that no reasonable jury could have found him guilty beyond a reasonable doubt because of inconsistencies and conflicts in the witnesses' testimony. This argument leaves us with little to review. "Reviewing the sufficiency of the evidence, '[i]t is axiomatic that [this court does] not pass upon the credibility of witnesses or the weight to be given their testimony.'" United States v. Goodale, 738 F.3d 917, 923 (8th Cir. 2013) (alterations in original) (quoting United States v. Clay, 618 F.3d 946, 950 (8th Cir. 2010)), cert. denied, 134 S. Ct. 2856 (2014). "'Credibility determinations are uniquely within the province of the trier of fact, and are entitled to special deference.'" Id. (quoting Sullivan v. Minnesota, 818 F.2d 664, 666 (8th Cir. 1987)) (internal quotation marks omitted). "'A trial court has neither the duty nor the authority to grant a motion for acquittal based on the credibility of a witness.'" United States v. Seibel, 712 F.3d 1229, 1237 (8th Cir.) (quoting United States v. Kirkie, 261 F.3d 761, 768 (8th Cir. 2001)), cert. denied, 134 S. Ct. 273 (2013). We find no reversible error in the district court's denial of Alaboudi's motion for acquittal based upon the credibility of witness testimony. See id.

## C. Eighth Amendment

Alaboudi argues his sentence constitutes cruel and unusual punishment because he did not force his victims to come to his apartment and thus his level of culpability is disproportionate to the sentence imposed. "This court reviews Eighth Amendment challenges de novo." United States v. Vanhorn, 740 F.3d 1166, 1169 (8th Cir. 2014).

Alaboudi was convicted of sex trafficking under 18 U.S.C. § 1591, which authorizes life sentences if, among other things, "the offense was effected by means of force, threats of force, fraud, or coercion . . . or by any combination of such means" or, even if such means were not used, the victim was under age 18. 18 U.S.C.

§ 1591(b)(1)-(2). "A sentence within the statutory range is 'generally not reviewable by an appellate court.'" <u>Vanhorn</u>, 740 F.3d at 1170 (quoting <u>United States v. Collins</u>, 340 F.3d 672, 679 (8th Cir. 2003)). "This is not 'the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality.'" <u>Id.</u> (quoting <u>United States v. Spires</u>, 628 F.3d 1049, 1054 (8th Cir. 2011)). Alaboudi concedes the crimes at issue are grave and clearly harmful to the victims and society. He argues only that his crimes were not severe enough to warrant four life sentences because he did not force the victims to come to his apartment. The statute authorized life imprisonment in this case because Alaboudi effected the offense by means of force, threats of force, and coercion, and because two of his victims were under 18. We find no support, either in our case law or in common sense, for the proposition that Alaboudi's crimes do not warrant the authorized statutory penalty merely because he did not force his victims to be present in the place where the crimes occurred.

## III. Conclusion

For these reasons, we affirm Alaboudi's conviction and sentence.

_____