# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-1252
_____

United States of America

*Plaintiff - Appellee*

v.

Craig Michael Ralston

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - Springfield

_____

Submitted: February 12, 2020
Filed: September 3, 2020

_____

Before SMITH, Chief Judge, COLLOTON and STRAS, Circuit Judges.

_____

SMITH, Chief Judge.

In 2018, a jury convicted Craig Ralston of sexually abusing a minor on a United States military installation ("Count 1"), *see* 18 U.S.C. § 2241(c), and transporting an individual across state lines to engage in sexual activity ("Count 2"), *see id.* § 2421. Ralston appeals his convictions and sentence, asserting multiple trial

errors and constitutional violations. Finding no reversible error, we affirm the judgment of the district court.[1]

## I. *Background*[2]

Ralston enlisted in the United States Army Reserve in 1996. He eventually entered active duty and was stationed at Fort Leonard Wood, Missouri, from February 17, 2003, to May 20, 2005. Ralston, his then-wife M.W., and their children moved into base housing in November 2003.

Upon settling at Fort Leonard Wood, the Ralstons attended Rock of Ages, a small church, in St. Robert, Missouri. Ralston volunteered in the church's music and children's ministries. At Rock of Ages, the Ralstons met and became acquainted with the families of R.B. and R.G. When they met, R.B. was about five years old, and R.G. was about 15 years old. R.B.'s father served in the Army and was also stationed at Fort Leonard Wood in March 2003 until approximately 2007.

In November 2015, a federal grand jury returned a two-count indictment against Ralston. Count 1 referenced Ralston's illegal sexual conduct with R.B.[3] between July 12, 2003, and July 1, 2007; Count 2 referenced his illegal sexual conduct with R.G.[4] between August 1, 2008, and October 1, 2008.

---

[1]The Honorable M. Douglas Harpool, United States District Judge for the Western District of Missouri.

[2]"Consistent with our standard of review, the . . . facts are described in the light most favorable to the verdict." *United States v. Alaboudi*, 786 F.3d 1136, 1139 (8th Cir. 2015) (internal quotation omitted).

[3]Count 1 referred to R.B. as Jane Doe 1. She was born in 1998 and had not attained the age of 12 during the relevant time period.

[4]Count 2 referred to R.G. as Jane Doe 2. She was born in 1990.

Before the four-day jury trial in June 2018, Ralston's trial counsel filed a motion to sever Counts 1 and 2. *See* Def.'s Mot. for Severance of Count I and Count II for Trial, *United States v. Ralston*, No. 6:15-cr-03103-MDH-1 (W.D. Mo. Oct. 23, 2017), ECF No. 51. In his motion, Ralston argued that the two charged "offenses are separate and distinct from each other, and that they are improperly joined." *Id.* at 1. He further claimed "that the joint trial of these two offenses will cause irreparable and substantial prejudice to [him]." *Id.* at 2. The government opposed Ralston's motion, and the district court subsequently denied it. Ralston did not challenge the ruling or raise additional concerns as to the joinder of the counts. The trial proceeded.

## A. *Count 1*

R.B. testified as the government's first witness. At the time of trial, she was 19 years old, a wife, and a mother. When R.B. was either five or six years old, R.B.'s mother asked M.W.—Ralston's then-wife—to babysit R.B. and R.B.'s younger brother while she attended a doctor's appointment. M.W. agreed to babysit.

The morning of the appointment, R.B.'s mother dropped off R.B. and R.B.'s younger brother at the Ralstons' base residence. R.B. testified that M.W. left the residence and that, after playing outside with the Ralston children for a while, she went inside to use the bathroom. R.B. stated that, while inside, Ralston led her to his daughters' bedroom. As she sat on the bed, R.B. grew uncomfortable as Ralston kneeled down and used his hands to touch her external genital area while she was still fully dressed. Ralston reassured R.B. that "it was fine" as she began to feel "[s]omething . . . inside of [her]." Trial Tr., Vol. 1, at 54, *United States v. Ralston*, No. 6:15-cr-03103-MDH-1 (W.D. Mo. June 12, 2018), ECF No. 143. Meanwhile, she felt burning and pain in her vaginal area and noticed that her shorts were off and that Ralston had positioned himself closer to her body.

Afterward, R.B. put her shorts back on, and Ralston told her "to go back outside to play with the kids." *Id.* at 57. She went back outside but did not tell the

other children or any adult what Ralston had done. She kept silent because she feared upsetting someone, getting into trouble, and being called a liar.[5] When R.B.'s mother arrived, M.W. still had not returned home. R.B. recalled that her mother was angry because M.W. was not home.

Eventually, R.B.'s family moved to Colorado, then to Hawaii, and finally to Florida based on her father's military assignments. R.B.'s mother testified that, while in Hawaii, R.B. began to experience anxiety, frequent nightmares, and unexplained medical issues. R.B. and her mother further testified that R.B., as a sophomore in Florida, experienced anger issues, depression, a decline in school grades, and suicidal thoughts and behavior. R.B. also revealed that she fought with her mom, smoked cigarettes, and took prescription pills around age 14. She stated that her erratic behavior was the result of failing to acknowledge a lot of "[m]emories of being hurt in Missouri" by Ralston and that she had to seek therapy. *Id.* at 64–65.

As she proceeded with therapy, R.B. wrote a poem for her English class. The government read a portion of the poem during its opening statement. Ralston did not object to the government reading R.B.'s poem. The district court admitted the poem into evidence, and R.B. also read it to the jury. The poem, in part, describes her experience with Ralston.[6] It states:

> My mind races as I sit confused on the bed, rotting underneath me/I see
> the dark silhouette of the monster that stole my childhood and my heart

---

[5]While living in Hawaii, M.W. called R.B.'s mother. That conversation prompted R.B.'s mother to ask R.B., who was then age 10 or 11, "if she had ever felt uncomfortable around anyone from Rock of Ages." *Id.* at 175. R.B. testified that "I told her no." *Id.* at 59.

[6]The poem also discussed a time in which R.B. thought that she would be violated again by her tennis coach in Hawaii.

races, /As fast as a scared gazelle running for its life/I close my eyes and repeat the words while a bit more of my innocence is stripped away . . . .

*Id.* at 66–67.

After R.B.'s teacher returned the poem, R.B.'s mother discovered it in R.B.'s room and questioned R.B. about it. R.B.'s mother reported R.B's disclosure of Ralston's actions to law enforcement. Rachel Happel, a child and adolescent forensic interviewer for the Child Victim Services Unit of the Federal Bureau of Investigation (FBI), interviewed R.B. when she was 15 and 16 years old.

On cross-examination, Ralston primarily attacked R.B.'s mother's credibility and her poor recollection of her relationships or communications with various individuals, including R.B.; the Ralstons; other Rock of Ages church members; and Patrick Thomas, a special agent for the FBI. During redirect, the government asked R.B.'s mother to discuss the effects of R.B.'s sexual abuse and the instant legal proceedings on her family. Although Ralston did not object, the district court asked the parties' attorneys to approach the bench and stated, "I'm trying to figure out how that was proper redirect." *Id.* at 202. The government responded, "He was impeaching her credibility by asking her questions about [M.W.], what information that she had." *Id.* The court further expressed, "That's not what your question was. . . . We're not going to be melodramatic on redirect. Nothing in his cross raised that issue. Redirect is limited to the scope of cross." *Id.* At Ralston's request, the court instructed the jury to disregard the question and response.

The government also presented testimony from Rick Ball. Ralston and Ball were cellmates in the St. Clair County, Missouri Jail while the instant case was pending disposition. According to Ball, Ralston stated "[t]hat he . . . couldn't beat [the] charge [of molesting a five-year-old girl] but he had some friends that w[ere] going to give him an alibi from people he knew at the Army." Trial Tr., Vol. 3, at 570,

*United States v. Ralston*, No. 6:15-cr-03103-MDH-1 (W.D. Mo. June 14, 2018), ECF No. 145. Ball testified that Ralston had also admitted "[t]hat he digitally penetrated her" with "[h]is finger" "until she said owee." *Id.* at 571.

### B. *Count 2*

R.G., the victim in Count 2, also testified as one of the government's witnesses. At the time of trial, R.G. was 28 years old. She testified that the Ralstons moved in with her family in Rolla, Missouri, when she was 15 years old.[7] She stated that she interacted with the Ralston family daily and that she and Ralston had joked around "like a daughter and father would do." Trial Tr., Vol. 2, at 232, *United States v. Ralston*, No. 6:15-cr-03103-MDH-1 (W.D. Mo. June 13, 2018), ECF No. 144.

After the Ralstons moved to Fayette, Missouri, 16-year-old R.G. left her home in Rolla and moved in with them. R.G. indicated that she had moved to prepare for missionary work with the Ralstons. She also testified that, while living there, Ralston asked her to kiss his cheek as she was getting ready for bed one night, but "he turned his head very quickly so [her] mouth landed on his." *Id.* at 235. She then expressed that Ralston walked into the bathroom while she was showering one day and would not leave when asked. He finally left after an uncomfortable delay.

Later, the Ralston family traveled to India to perform missionary work; R.G., however, decided not to go to India and returned to live with her mom and stepfather in Rolla at the age of 17.

After about a year and a half, Ralston returned from India in 2008 and contacted R.G.'s mother to ask whether R.G. could visit him in Kansas City, Missouri, for a week or two. R.G. was 18 years old. R.G.'s mother and Ralston

---

[7]At this point, Ralston had been discharged from the Army and was involved with missionary work.

arranged for R.G. to go to Kansas City. There, Ralston and R.G. stayed with Michael Green and his family. R.G. did not know the Greens and did not own a vehicle or a cell phone. The Greens arranged for R.G. to sleep on the couch in the living area and for Ralston to sleep on the floor in one of their spare rooms.

During her testimony, R.G. recalled four sexual assaults by Ralston that occurred at the Greens' home and on a trip in Tennessee. Each time, he pulled down her pants and underwear and inserted his penis into her vagina without her consent.

The first time, R.G. and Ralston were talking in the room where Ralston slept. She was lying on the floor. Ralston suddenly removed R.G.'s jeans. She resisted. She stated that she "t[old] him no." *Id.* at 244. Ralston forced himself onto her, she explained, but she did not scream because the Greens were sleeping. She recounted that Ralston pulled her jeans and underwear down to her knees and that his pants and underwear were either around his knees or ankles. Afterward, she said that Ralston put his penis inside of her vagina and stopped when he ejaculated.

The second time occurred the next day. R.G. testified that she went to the spare room that Ralston slept in thinking that nothing else would happen; however, Ralston repeated the same behavior. This time, she asserted, that Ralston "held [her] arms down" on the floor. *Id.* at 248, 250. While "t[elling] him no," she tried to push him away, but she did not have enough strength. *Id.* at 249–50. R.G. did not scream or yell because the Greens were sleeping, and Ralston stopped only after removing her pants and underwear, inserting his penis inside her vaginal area, and ejaculating. She revealed, "I didn't want to be there anymore." *Id.* at 252. But Ralston, who had saved R.G.'s mother's phone number in his cell phone, would not let R.G. use it to call her mother, and she could not use the Greens' phones because she had not memorized her mother's phone number.

R.G. testified that the third incident occurred "[i]n a car" parked in the Greens' driveway. *Id.* at 253. She recalled that it was around "ten or eleven at night" and that she did not run away because she was not familiar with the area. *Id.* at 253. They were in the back of the car, and she stated, "I told him no." *Id.* at 254. She indicated that their clothes from the waist down had been removed and that Ralston had placed his penis inside her vagina and ejaculated again.

The fourth and last incident occurred during a trip to Knoxville, Tennessee. Ralston and R.G. went to Knoxville to pick up a car for M.W., who was still in India at the time. R.G. stated that they stayed in Knoxville for approximately two days with one of Ralston's friends. There, Ralston woke up R.G. while she was sleeping on the couch, got on top of her, removed her pajama pants and underwear, inserted his penis into her vagina, and ejaculated. She did not scream because Ralston's friend was asleep, and she did not think that he would hear her. "[She] told [Ralston] to stop" and tried to push him off but could not. *Id.* at 259.

Thereafter, Ralston and R.G. returned to Missouri. R.G. testified that Ralston told her not to talk about anything because he could get into trouble. R.G.'s mother eventually picked up R.G. R.G. did not disclose anything to her mother because she "was embarrassed and ashamed," but she did tell M.W. in January 2009. *Id.* at 264. M.W. then informed R.G.'s mother, who drove R.G. to the Kansas City Police Department the following day. Detective Ryan Alden interviewed R.G. She reported that Ralston raped her at least four times in October 2008.

Ralston's former cellmate, Ball, also testified as to Count 2. Ball recalled that Ralston described his relationship with R.G. as consensual. According to Ball, Ralston stated that R.G. "liked rough sex [and] that they role played" while also expressing that "[e]very time she'd say no, she really meant yes, so that's what he did." Trial Tr., Vol. 3, at 572–73.

Additionally, Agent Thomas testified that he began investigating Ralston after R.B.'s mother reported that Ralston sexually abused R.B. at Fort Leonard Wood. Agent Thomas interviewed Ralston at the Winfield, Kansas Correctional Facility in September 2014.[8] During the recorded interview, Ralston discussed his relationship with R.G. Ralston acknowledged knowing R.G. but asserted that he had consensual sexual intercourse with her. He also expressed that the two had traveled to Knoxville together on one occasion. The jury watched an abbreviated version of the interview. Also, during the recorded interview, Ralston admitted to knowing R.B.'s parents but did not recall whether they had children.

On recross-examination of Agent Thomas, Ralston's trial counsel sought to analogize R.G.'s inconsistent statements with that of Ralston's inconsistency. Earlier, Agent Thomas attributed R.G.'s inconsistency to the lengthy time lapse between Ralston's sexual misconduct against her in 2008 and her interview with Agent Thomas in 2014. Ralston's trial counsel asked Agent Thomas a series of questions demonstrating that the approximate ten-year time lapse between the time period of Count 1 and Agent Thomas's interview of Ralston contributed to Ralston's inability to remember R.B.

On re-redirect, the government asked Agent Thomas, "[D]id [R.G.] acknowledge that she had been raped at least three times by the defendant?" Trial Tr., Vol. 3, at 640. He responded, "She did . . . ." *Id.* Ralston did not object to the question, but in the presence of the jury, the district court stated, "I'm trying to figure out how that was within the scope of the recross." *Id.* The parties' attorneys then approached the bench. The court informed the government that it would not "be allowed to abuse the rules." *Id.* Following the sidebar conversation, the court struck

---

[8]Ralston was serving a sentence in the Kansas Department of Corrections because he had been convicted of two felony counts of aggravated indecent liberties with a child. *See* Kan. Stat. Ann. § 21-5506(b)(3)(A) (formerly § 21-3504(a)(3)(A), *repealed by* Laws 2010, ch. 136, § 307; Laws 2011, ch. 30, § 288 (July 1, 2011)).

the question and Agent Thomas's testimony to the extent that they had already been discussed in previous testimony.

### C. *Evidence Admitted Under Federal Rules of Evidence 413 and 414*[9]
### 1. *State Convictions*

In an unrelated case, Ralston pleaded nolo contendere to two felony counts of aggravated indecent liberties with a child in Kansas state court. The indecent conduct involved J.W., who is M.W.'s younger sister. The district court admitted into evidence a certified copy of Ralston's state convictions.

J.W. was supposed to testify as a prosecution witness, but the government, before the start of trial, informed the district court that J.W. was on bed rest due to preterm pregnancy contractions and would not be available to testify at trial. Based on J.W.'s unavailability, the government sought to admit the transcript of J.W.'s testimony given during a state preliminary hearing on January 14, 2010. Ralston's trial counsel objected, and the district court did not admit the transcript. The court, however, allowed J.W.'s testimony to be read to the jury.

J.W.'s testimony described Ralston's inappropriate touching of her vaginal area when she was around 11 or 12 years old. She also recounted that he raped her when she was 13 years old. She did not tell anyone until she was a junior in college.

---

[9]"In a criminal case in which a defendant is accused of a sexual assault, the court may admit evidence that the defendant committed any other sexual assault. The evidence may be considered on any matter to which it is relevant." Fed. R. Evid. 413(a). Likewise, "[i]n a criminal case in which a defendant is accused of child molestation, the court may admit evidence that the defendant committed any other child molestation. The evidence may be considered on any matter to which it is relevant." Fed. R. Evid. 414(a).

Ball; M.W.; and Mark Elhardt, a Rock of Ages Church member, testified that Ralston admitted to having sexual relations with J.W. On direct examination, M.W. told the jury and district court that she decided to leave Ralston in January 2009. The government later asked, "The fact that [Ralston] . . . also had sexual contact with your sister still weighed very heavily on your heart at that time as well?" Trial Tr., Vol. 2, at 474. M.W. responded, "Yes." *Id.* Ralston did not challenge the government's question. At the time of trial, Ralston and M.W. were divorced.

2. *Accusations of Sexual Assault and Child Molestation in India*

In August 2007, the Ralston family traveled to India to perform missionary work after Ralston's discharge from the Army.

While the Ralstons were in India, M.W. hired a native female housekeeper to assist her with daily housework. M.W. recounted three incidents from India. First, the housekeeper informed M.W. that Ralston requested sexual favors from her. Second, M.W. required hospitalization due to illness. When M.W. returned from the hospital, the housekeeper reported to her that Ralston raped her four times during M.W.'s absence. Third, the housekeeper's daughter disclosed to M.W. that Ralston inappropriately touched her pubic region and that she felt pain in that area. M.W. testified that, when she confronted Ralston about the accusations, he asked her to apologize to the housekeeper and her daughter. In addition, M.W. remembered Ralston asking her to buy chocolate for the housekeeper's daughter.

The district court instructed the jury that M.W.'s testimony consisted of hearsay and that it could not be considered for the truth of the matter asserted. It, nonetheless, informed the jury that any admissions by Ralston could be considered as true substantive evidence. Ralston objected to M.W.'s testimony regarding the Indian women's statements as unreliable.

During his examination, Ball stated that Ralston, while incarcerated with him, admitted that he left India because the housekeeper and her daughter alleged that he raped and molested them.

### 3. *Digital Forensic Evidence*

In May 2009, Ralston was involved in a separate investigation, involving the criminal misuse of his computer. The Lyon County, Kansas Sheriff's Office ("Sheriff's Office") initiated the investigation, executed a search warrant at the residence where Ralston was living, and seized two Apple laptops and an iPhone. The Sheriff's Office submitted the seized items to the Heart of America Regional Computer Forensics Laboratory, where FBI Special Agent Kevin Hall conducted a forensic examination. It was determined that the Apple MacBook Pro laptop belonged to Ralston.

Agent Hall reviewed the computer's internet browser history and drafted a corresponding report. The history consisted of multiple terms and searches, bookmarked websites, and file path names. Agent Hall also discovered software programs for Limewire peer-to-peer sharing and Keylogger.

Later, Agent Thomas also reviewed the data discovered by Agent Hall. Agent Thomas testified that some of the discovered file path names or downloads were consistent with child pornography searches. But neither Agent Hall nor Agent Thomas recovered any actual videos or images of child pornography.

### D. *Thomas Johnson's Right Against Self-Incrimination*

Ralston planned to call Cody Davidson and Thomas Johnson during his case-in-chief to counter Ball's testimony. Both Davidson and Johnson were Ralston's podmates in the St. Clair County, Missouri Jail while this case was pending disposition. Davidson testified that he never heard Ralston admit to the offenses in

the instant case; however, Johnson invoked his Fifth Amendment right against self-incrimination and refused to testify.

At the time of Ralston's federal trial, Johnson had entered a conditional plea in his own federal case. While awaiting federal sentencing, Johnson expressed that he did not want his credibility attacked on the witness stand in Ralston's case. Johnson was also concerned that his testimony would interfere with his ability to appeal a potential suppression issue in his case. Johnson further stated similar concerns with respect to his pending state cases in Kansas and Missouri. The district court acknowledged its skepticism of Johnson's invocation, but after speaking with the parties' and Johnson's attorneys and questioning Johnson under oath, it ruled that Johnson did not have to testify.

## E. *Closing Arguments and Verdict*

After Ralston's defense rested, the government and Ralston made their closing arguments. Relevant to this appeal, the government made the following statements during its closing:

> Members of the jury, it boggles the mind. What kind of man sexually assaults a five-year-old girl that he goes to church with, is in a Sunday school class? What kind of man sexually assaults an 18-year-old girl who looked to him as a father figure? What kind of man sexually assaults his wife's sister, sexually assaults his housekeeper and her child in India, who downloads child pornography and then attempts to cover it up by the use of religion and submission against his wife?

> Jury trials often tell us about the measure of a man. For the last week we've heard the kind of man that would do these things, and that man is the defendant, Craig Ralston.

> . . . .

[Ralston] told Ricky Ball, remember, Oh, she likes it rough. She says no but that means yes. And I pray to God that we have grown enough as a society to recognize . . . when a woman says no, she means, No, I do not wish for you to have sex with me, I do not wish for you to rape me.

Trial Tr., Vol. 4, at 713, 725, *United States v. Ralston*, No. 6:15-cr-03103-MDH-1 (W.D. Mo. June 15, 2018), ECF No. 146. Ralston did not object to these statements.

The jury returned a verdict, finding Ralston guilty of both counts. The district court sentenced Ralston to 360 months' imprisonment on Count 1 to run concurrently with a 120-month sentence on Count 2 and to a lifetime of supervised release.

## II. *Discussion*

Ralston raises several claims, alleging reversible trial error. He requests that we vacate his convictions and sentence, dismiss Count 2 based on its statute of limitations, and remand to the district court for a new trial on Count 1.

### A. *Plain-Error Claims*
#### 1. *Alleged Prosecutorial Misconduct*

Ralston argues, "From the first sentence of its opening statement through its closing argument, the government appealed to the passions and prejudices of the jury." Appellant's Br. at 29. The district court, he claims, erred in failing to prevent the government's misconduct despite "recogniz[ing] that the government was repeatedly crossing the line; that it was introducing irrelevant testimony; [and] that it was showboating." *Id.* at 35. He opines that the court should have declared a mistrial *sua sponte*.

Here, Ralston challenges five prosecutorial statements and examination questions permitted by the district court. We review for plain error because Ralston did not object to their admission. *See United States v. Bentley*, 561 F.3d 803, 809–10

-14-

(8th Cir. 2009) ("[The defendant] objected at trial to only one of the remarks that he now cites as error. We review the remaining claims for plain error . . . .").

> Under the plain error standard of review, we may only grant relief if [Ralston] demonstrates (1) error, (2) that is plain, and (3) that affects [his] substantial rights. Even if these three prongs are satisfied, we should only exercise our discretion to correct plain error if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.

*United States v. Brown*, 702 F.3d 1060, 1065 (8th Cir. 2013) (cleaned up).

We first address Ralston's assertion that the district court erred by not declaring a mistrial *sua sponte* based on the government's reading of R.B.'s class poem during its opening statement. The poem expressed R.B.'s feelings, stemming from Ralston's sexual abuse of her. He contends that the reading of the poem was inherently argumentative, improper, and prejudicial. We disagree.

"The prosecutor's opening statement should objectively outline the evidence reasonably expected to be introduced during the trial." *United States v. Kalagian*, 957 F.2d 527, 528 (8th Cir. 1992) (per curiam). And here, the government's opening served that purpose.

As it relates to Count 1, the government's partial reading of R.B.'s poem conveyed the impact of Ralston's acts to the jury and was consistent with the facts of the case. The district court later admitted the poem into evidence as a part of the government's case-in-chief. During her testimony, R.B. read and explained the poem without any objections from Ralston. The government's reading of R.B.'s poem in its opening was neither improper nor unfairly prejudicial. Even if reading the poem were improper, the district court did not plainly err, considering "the weight of the

evidence was heavy, and there is no reasonable probability that the verdict would have changed absent the [reading of the poem]." *Bentley*, 561 F.3d at 810–11 (cleaned up).

Second, Ralston argues that the district court erred in failing to declare a mistrial *sua sponte* based on the government asking R.B.'s mother, on redirect examination, to discuss how R.B.'s experience affected their family. The district court acknowledged that the government's question was not within the scope of the cross-examination, which had attacked R.B.'s mother's credibility and her ability to recall the specific facts of Count 1. The district court on its own initiative rebuked the government for the breadth of its line of questioning. The court then "instructed the jury not to consider [R.B.'s mother's] last answer" at Ralston's request. Appellant's Br. at 31.

Although objectionable, we cannot say that the government's question and the witness's testimony were so prejudicial that the court should have declared a mistrial *sua sponte*. Ralston never moved for a mistrial, the court quickly cured the improper questioning and witness testimony, and Ralston's guilty verdict is supported by sufficient evidence. On this record, we find no plain error.

Third, Ralston contends that the district court erred in failing to declare a mistrial *sua sponte* based on the government asking M.W. the following leading question during direct examination: "The fact that [Ralston] . . . also had sexual contact with your sister still weighed very heavily on your heart at that time as well?" Trial Tr., Vol. 2, at 474.

"Whether leading questions are permitted is a matter generally left to the discretion of the trial judge." *United States v. Wright*, 540 F.3d 833, 844 (8th Cir. 2008) (internal quotation omitted). Ralston is correct that the question was leading. But, Ralston did not object. In addition, Ralston had the opportunity to cross-examine

M.W. in the instant case. *See id.* at 845. We further note that Ralston's state convictions relating to J.W., M.W.'s younger sister, were admitted into evidence. Even assuming that the leading question was improper, "we see no substantial and injurious influence on the verdict arising from the manner in which the examination was conducted." *Id.* (internal quotation omitted). When this question was posed, Ralston's illegal sexual contact with J.W. was an established fact.

Fourth, Ralston claims that the district court erred in failing to declare a mistrial *sua sponte* based on the government's question to Agent Thomas on re-redirect examination. The government asked Agent Thomas whether "[R.G.] acknowledge[d] that she had been raped at least three times by the defendant." Trial Tr., Vol. 3, at 640. The district court, in front of the jury, asked the government whether that question could fit within the scope of Agent Thomas's recross-examination. In his recross, Ralston's trial counsel—based on extended lapses in time between the applicable conduct and FBI interviews—compared R.G.'s inability to remember the exact details of the sexual crime committed against her with Ralston's inability to remember R.B. In a sidebar conversation, the district court informed the government's counsel that he would not "be allowed to abuse the rules." *Id.* It further stated, "Oh, that was blatant. You wanted to get the last dig in. And I'm going to strike it." *Id.* at 641. The court struck the examination question and Agent Thomas's answer to the extent they were cumulative to previous testimony.

As the government points out, "Ralston did not object to the question, to [Agent] Thomas's answer, or to the court's decision to strike the answer." Appellee's Br. at 35. The district court's instruction cured any harm that may have resulted from the government's improper re-redirect question. Simply put, Ralston has not shown the requisite prejudice to warrant reversal.

Lastly, Ralston posits that the district court erred in failing to declare a mistrial *sua sponte* based on the government's closing argument. The closing, according to

-17-

Ralston, improperly attacked his character and urged the jury "to use its decision" "to serve some larger social objective" as opposed to merely punishing him for the proven crime. Appellant's Br. at 33 (internal quotation omitted).

As noted above, the prosecutor's closing argument included these statements: "What kind of man sexually assaults a five-year-old girl that he goes to church with, is in a Sunday school class? What kind of man sexually assaults an 18-year-old girl who looked to him as a father figure?" and "[Ralston] told Ricky Ball, remember, Oh, she likes it rough. She says no but that means yes. And I pray to God that we have grown enough as a society to recognize . . . when a woman says no, she means, No . . . ." Trial Tr., Vol. 4, at 713, 725.

"A prosecutor should not urge a jury to convict for reasons other than the evidence; arguments intended to inflame juror emotions or implying that the jury's decision could help solve a social problem are inappropriate." *Alaboudi*, 786 F.3d at 1144 (internal quotation omitted).

We conclude that the district court's decision not to declare a mistrial was not plain error. The government's statements during its closing did not misrepresent the evidence that was admitted and considered by the jury to convict Ralston. We highlight that "[u]nless calculated to inflame, an appeal to the jury to act as the conscience of the community is not impermissible." *United States v. Sanchez-Garcia*, 685 F.3d 745, 753 (8th Cir. 2012) (internal quotation omitted). In short, a mere reference to lamentable societal conditions is not synonymous with a "'community conscience' argument" seeking to inflame the jurors against the defendant. *See Alaboudi*, 786 F.3d at 1145.

Because "a finding that each particular instance of misconduct was harmless does not end the inquiry," we must also consider whether the cumulative effect of the government's alleged misconduct violated Ralston's right to a fair trial. *United States*

-18-

*v. Wadlington*, 233 F.3d 1067, 1080 (8th Cir. 2000). The asserted evidentiary errors "occurred at different times over the course of the [four] day trial, during which the [g]overnment presented ample evidence of [Ralston]'s guilt." *Id.* Upon our review of the entire record, we hold that the cumulative effect of the alleged prosecutorial misdeeds did not violate Ralston's right to a fair trial.

To summarize, the government presented testimony from 16 witnesses, including R.B. and R.G.; a recorded FBI interview of Ralston's admission to having sexual relations with R.G.; evidence of Ralston's prior sexually related convictions; evidence of other similar allegations against Ralston; and digital forensic evidence consistent with Ralston engaging in other sexual-criminal behavior. Moreover, Ralston concedes that the district court provided curative instructions to the jury when necessary and struck portions of the improper examination questions and witness testimony. Ralston's arguments simply do not establish the kind of cumulative and pervasive misconduct that has warranted reversal in other cases. *See, e.g.*, *United States v. Conrad*, 320 F.3d 851, 855–57 (8th Cir. 2003).

### 2. *J.W.'s Testimony from the State Preliminary Hearing*

Furthermore, Ralston argues that the district court erred in allowing the government to read to the jury J.W.'s testimony from a preliminary hearing conducted in Kansas state court. He contends that the government failed to offer proof that she was unavailable to testify at Ralston's federal trial. The preliminary hearing involved Ralston's state charges in which he pleaded no contest to two felony counts of aggravated indecent liberties with J.W. Ralston claims that "[t]he only statement on the record was that [J.W.] had . . . some preterm contractions and was on bed rest." Appellant's Br. at 45. Ralston further claims that this does not meet the standard set forth in Federal Rule of Evidence 804(a) and that "although the defense is allowed to cross-examine at a preliminary hearing, the scope of such an examination is much more circumscribed and limited than it is at trial." *Id.* at 47. The admission of J.W.'s

testimony, according to Ralston, also violated his Sixth Amendment right of confrontation because it was testimonial.

The government responds that "Ralston waived any claim that J.W. was not medically unavailable when he told the court, 'we're not disputing that at all.'" Appellee's Br. at 46 (quoting Trial Tr., Vol. 1, at 8–9). Also, the government points out that Ralston was present at the state preliminary hearing and "had sufficient opportunity and a similar motive to cross-examine J.W. during the preliminary hearing." *Id.* The government thus argues that "[J.W.'s] testimony was admissible both under the Confrontation Clause and Federal Rule of Evidence 804(b)(1)." *Id.*

As with his prosecutorial misconduct allegations, Ralston failed to object to the reading of J.W.'s prior testimony on the basis of the Confrontation Clause. We thus review for plain error. *See United States v. Rodriguez*, 484 F.3d 1006, 1013 (8th Cir. 2007) ("Because [the defendant] did not raise a Confrontation Clause objection to this testimony at trial, we review his claim for plain error."); *United States v. Johnson*, 688 F.3d 494, 504 (8th Cir. 2012) ("[S]uch an objection must adequately put the district court and the prosecution on notice of the grounds on which the defendant meant to object."); Appellant's Br. at 48 n.5 ("To the extent that defense counsel's acquiescence results in a failure to preserve this objection to permitting the reading of the transcript, the trial court's decision to admit this testimony amounted to plain error because it was inadmissible and in violation of the Confrontation Clause and harmed [Ralston].").

The Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004). Furthermore, Federal Rule of Evidence 804(a)(4) provides that a witness is unavailable if she has a "then-existing infirmity [or] physical illness." Consistent with the Confrontation Clause, this unavailable

-20-

witness's testimony from a preliminary hearing in a prior case will not violate the hearsay rule if the testimony is "offered against a party" in a subsequent case "who had . . . an opportunity and similar motive to develop it by . . . cross- . . . examination." Fed. R. Evid. 804(b)(1)(B).

At the start of Ralston's trial, J.W., who was pregnant, began experiencing preterm contractions. The government represented to the district court that she was not willing to make the drive to Springfield, Missouri, for the trial. The government, however, did not provide any medical documentation to prove J.W.'s unavailability. But despite the district court's request and the government's failure to produce medical documentation, Ralston did not dispute J.W.'s unavailability when questioned by the court. *See* Trial Tr., Vol. 1, at 8–9. His trial counsel stated, "[W]e're not disputing that" "she's medically not able to be here." *Id.* at 9.

We agree with the government that Ralston waived his challenge as to J.W.'s unavailability. *See United States v. Ford*, 888 F.3d 922, 925–26 (8th Cir. 2018) ("Waiver is the intentional relinquishment or abandonment of a known right, whereas forfeiture is the failure to make the timely assertion of a right. The former precludes review altogether, while the latter requires a plain-error standard of review." (cleaned up)). After conceding J.W.'s unavailability, Ralston cannot now claim that the government did not sufficiently prove it.

Ralston also had an opportunity and similar motive to cross-examine J.W. on her account of the allegations at the state preliminary hearing. *See Crawford*, 541 U.S. at 68 ("We leave for another day any effort to spell out a comprehensive definition of 'testimonial.' Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing . . . ." (footnote omitted)). J.W. testified under oath about Ralston's sexual assault. At that hearing, Ralston's counsel cross-examined J.W. regarding the substance of her testimony including the basic facts,

inconsistencies in her testimony, and her delay in reporting the incident. *See California v. Green*, 399 U.S. 149, 165–66 (1970).

We recognize that a preliminary hearing is more circumscribed than an actual trial, but that and any other differences are not dispositive here. *See, e.g.*, *Morrow v. Wyrick*, 646 F.2d 1229, 1233 (8th Cir. 1981) ("reject[ing] petitioner's argument[s] that different counsel at the preliminary hearing and at trial undermines the reliability of the preliminary hearing proceeding" and "that the preliminary hearing testimony was 'unduly prejudicial' because it was 'read' to the jury by third parties and . . . was not subjected to 'face-to-face confrontation'"). We thus conclude that the district court did not plainly err by admitting J.W.'s prior testimony.

### 3. *Right to Call Johnson as a Witness*

Furthermore, Ralston contends that the district court abused its discretion by not compelling Johnson to testify. He claims that this error deprived him "of his right to compulsory process and confrontation." Appellant's Br. at 23. The government replies, "Ralston made no showing that Johnson's testimony would be material and favorable," which is necessary to defeat Johnson's right against self-incrimination. Appellee's Br. at 56.

We normally review for an abuse of discretion a district court's decision not to compel testimony after a witness has claimed a Fifth Amendment privilege. *United States v. Washington*, 318 F.3d 845, 856 (8th Cir. 2003). But, Ralston failed to object to the district court's ruling on Johnson's right against self-incrimination. We therefore review for plain error. *See* Trial Tr., Vol. 3, at 644–45 (failing to object); Appellant's Br. at 51 n.6 ("To the extent that defense counsel's acquiescence results in a failure to preserve this objection to the failure to permit compulsory process, the trial court's decision to exclude this testimony amounted to plain error because it was admissible and critical to the defense and its exclusion harmed [Ralston].").

Ralston's "challenge represents a conflict between his right to call [Johnson] as a witness in his defense and [Johnson]'s right to avoid self-incrimination." *United States v. Blaylock*, 421 F.3d 758, 770 (8th Cir. 2005). "It is well settled that an accused's right to compulsory process must yield to a witness's Fifth Amendment privilege not to give testimony that would tend to incriminate him or her." *Id.* (quoting *United States v. Habhab*, 132 F.3d 410, 416 (8th Cir.1997)).

"The Self-Incrimination Clause of the Fifth Amendment guarantees that no person 'shall be compelled in any criminal case to be a witness against himself.'" *Id.* (quoting *Withrow v. Williams*, 507 U.S. 680, 688 (1993) (quoting U.S. Const. amend. V)). "Nothing in the Fifth Amendment, or in any other constitutional provision, provides a means for overcoming this privilege once a potential witness has invoked it." *Id.* (quoting *United States v. Moussaoui*, 382 F.3d 453, 466 (4th Cir. 2003)). Ralston's "Sixth Amendment right to compulsory process does not include the right to compel [Johnson] or any other witness to waive his or her Fifth Amendment privilege against self-incrimination." *Id.*

Johnson "did not want to subject himself to the government's cross-examination." *Id.* Johnson's counsel explained his reasoning for invoking his right to avoid self-incrimination. Under a thorough examination, Johnson also informed the district court that he was a defendant in pending federal and state prosecutions and that he did not want to disclose any potential inculpatory statements in Ralston's federal prosecution that may affect his own cases. Although the court criticized Johnson's reasoning to a certain degree, it concluded that Johnson's "right to preserve his Fifth Amendment privilege against self-incrimination trumped [Ralston]'s right to compel him to testify." *Id.* The district court did not plainly err by not requiring Johnson to testify.

## B. *Abuse-of-Discretion Claim*

Next, Ralston argues that the out-of-court statements made by the Indian housekeeper and her daughter were inadmissible as hearsay. M.W. testified as to these out-of-court statements. Ralston points out that his trial counsel objected to the testimony as unreliable and that "[t]he court ruled that the government could elicit testimony about admissions allegedly made by . . . [Ralston] to his wife, but that the evidence could not be used to establish the truth of the allegations." Appellant's Br. at 39. Ralston asserts that the government ignored this ruling and, thus, violated his right of confrontation.

M.W.'s testimony, according to the government, was not hearsay because it was not offered for the truth of the matter asserted. The government avers that M.W.'s testimony about the out-of-court statements simply provided context for other admissible statements, such as Ralston's admissions to sexually violating the Indian women—which were admissible as party-opponent admissions. The government further asserts that the district court provided an adequate limiting instruction and that Ralston's trial counsel did not seek a further limiting instruction.

"We review the district court's evidentiary rulings for abuse of discretion," *United States v. Coutentos*, 651 F.3d 809, 819 (8th Cir. 2011), but to the extent that Ralston failed to raise his confrontation clause argument in the district court, our review is for plain error. Ralston's argument fails under either standard.

Ralston concedes that the district court provided the jury with a limiting instruction as to M.W.'s testimony about her conversations with the Indian housekeeper and her daughter, accusing Ralston of raping and sexually assaulting them. Specifically, that instruction provided:

> The statements that the ladies and the daughter from India made to the witness would be hearsay but they're not admitted for the truth of what

they said but to explain why she then in turn would have had a conversation with her husband. That's the reason you're told that. Now, if her husband made an admission, you can consider that as any other piece of evidence, just so you understand.

People sit over there sometimes and they think, why isn't that hearsay? And to explain, that wasn't offered for the truth to prove what occurred but only to explain to you why it was that this witness would approach her husband and have that conversation.

Trial Tr., Vol. 2, at 466.

Ralston's contention that the government ignored the district court's instruction is meritless. "Statements providing context for other admissible statements are not hearsay because they are not offered for their truth. As a result, the admission of such context evidence does not offend the Confrontation Clause because the declarant is not a witness against the accused." *United States v. Spencer*, 592 F.3d 866, 879 (8th Cir. 2010) (internal quotation omitted). In regards to Ralston's confession to M.W., i.e., party-opponent admission, Ralston was afforded the opportunity to cross-examine M.W. *See* Fed. R. Evid. 801(d)(2)(A) (providing that a statement "is not hearsay" if it "is offered against an opposing party and . . . was made by the party in an individual or representative capacity"). Therefore, the district court did not abuse its discretion, much less plainly err, in allowing M.W. to testify as to the out-of-court statements made by the Indian women.

### C. *Ineffective-Assistance-of-Counsel Claims*

Finally, Ralston raises multiple ineffective-assistance-of-counsel claims. He first questions his trial counsel's efforts to secure severance of Counts 1 and 2. He argues that his trial counsel should have argued that Count 2 was barred by its

five-year statute of limitations[10] and that failure to do so renders his trial counsel's assistance ineffective. Ralston's remaining arguments are that he received ineffective assistance of counsel based on his trial counsel's (1) failure to object to the alleged prosecutorial misconduct, (2) failure to object to the reading of J.W.'s prior testimony from a Kansas state preliminary hearing, (3) failure to object to the district court's ruling that did not compel Johnson to testify, and (4) failure to object when the government allegedly ignored the district court's evidentiary ruling on the out-of-court statements made by the Indian women.

As a general rule, "ineffective assistance of counsel claims are better left for post-conviction proceedings under 28 U.S.C. § 2255. We will not hear ineffective assistance claims on direct appeal unless the record is fully developed, our failure to act would be a plain miscarriage of justice, or the counsel's errors are readily apparent." *United States v. Long*, 721 F.3d 920, 926 (8th Cir. 2013) (cleaned up).

As in *Long*, "our decision to affirm [Ralston]'s conviction[s] is based largely on the plain error standard of review. We employed this standard of review because the defense failed to object to the relevant portions of the trial." *Id.* Therefore, in evaluating Ralston's ineffective-assistance-of-counsel claims, "it will be necessary to develop facts outside of the record presently before the court, such as whether the decision not to object was due to trial strategy. Thus, we decline to consider [Ralston]'s ineffective assistance of counsel claim[s] in this direct appeal of his conviction[s]." *Id.* at 926–27.

### III. *Conclusion*

We affirm the district court's judgment.

_____

---

[10]Ralston argues that 18 U.S.C. § 3282 governs Count 2's statute of limitations. The government submits that the limitations period is governed by 18 U.S.C. § 3299, which provides for an unlimited period to charge a § 2421 violation as in Count 2.